William J. PHILLIPS and Dorothy R. Phillips, Plaintiffs-Appellees,

v.

HUNTER TRAILS COMMUNITY ASSOCIATION, Defendant-Appellant.

No. 81–2372.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1982.

Decided Aug. 3, 1982.

Rehearing and Rehearing En Banc Denied Sept. 7, 1982.

Wayne B. Giampietro, DeJong, Poltrock & Giampietro, Chicago, Ill., for defendant-appellant.

F. Willis Caruso, Leadership Council for Metropolitan Open Communities, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and GRANT,* Senior District Judge.

CUMMINGS, Chief Judge.

In 1979 and 1980 William J. Phillips, a successful black businessman, was looking for a new house. He found what he wanted in the Hunter Trails subdivision of Oak Brook, Illinois—a 12,000 square-foot, tri-level home on a large lot. He offered $675,-000 for it, and his offer was accepted by the owner, Dennis Broderick, on June 13, 1980.

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

Mr. Phillips deposited $75,000 in earnest money, and a closing date was set for July 21, 1980. In the expectation that they would be able to move into the house as agreed, the Phillipses sold their house in Homewood, Illinois, agreeing to give up possession on July 21, and obtained a mortgage commitment on the new house from Seaway Bank on June 24, 1980.

Between June 24 and July 17, the Phillipses heard nothing about any difficulties with their move. But events were moving rapidly in Hunter Trails. On June 18 fifteen people came to an early morning meeting—officers and directors of the Hunter Trails Community Association and some homeowners—but Mr. Broderick, who had the only first-hand knowledge about the terms of the sale and who was also the vice-president of the Association and a Board member, was not notified of the meeting and did not attend.

One of the covenants that attached to every piece of property in the Hunter Trails subdivision gave the Association a thirty-day right of first refusal on any proposed sale. Accordingly, the Association could have forestalled the Phillipses by buying Broderick's house for $675,000. The outcome of the June 18 meeting was a decision instead to assign the Association's first refusal right to a syndicate or limited partnership. In the days that followed, no such assignee could be found or formed. The Association therefore turned its attentions to Mrs. Jorie Ford Butler as a potential purchaser. Mrs. Butler's family had founded Oak Brook and various members of the Butler family still owned property in Hunter Trails. Mrs. Butler herself had looked at the Broderick house in the early spring of 1980, before the Phillipses saw it, but was not interested in buying it then. When the Association proposal was presented to her in mid-July, however, she agreed to buy the Association's first-refusal option for $10,000 and exercised the option on July 17, agreeing to pay the Brodericks $675,000 for their house. They refused to close the sale on July 19 because she would not indemnify them from possible liability to the Phillipses.

None of these developments were communicated to the Phillips family until July 17, the Thursday before the scheduled Monday closing. By then they were accomplished facts. Predictably, the Phillipses were disappointed, humiliated, and angry. They also had serious practical problems. Having sold their Homewood house, they were forced to live in hotels and with relatives until they found a rental apartment in Hinsdale. They had to put most of their furniture in storage and live out of suitcases. Two of their cars were stolen and other property was lost while they were without a permanent home. And they had to bring a lawsuit to vindicate their right to live in the house they had chosen in Hunter Trails.

That lawsuit was filed on July 22, 1980, under Section 1 of the Civil Rights Act of 1866 (42 U.S.C. § 1982) and the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. The suit sought an immediate injunction to prevent the defendants from concluding the sale of the Broderick house except to the Phillipses, and—on the merits—equitable and declaratory relief, actual and punitive damages, attorneys' fees and costs. After a ten-day trial, Judge Prentice Marshall found for the Phillipses. His final order, entered July 22, 1981, required the house to be sold to them at the agreed price and awarded them actual damages of $52,675 against the Association and Mrs. Butler jointly and severally (but see note 5, infra), punitive damages of $100,000 against each of the two defendants, $35,000 in attorneys' fees, and $1,016 in costs. The Phillipses moved into the house shortly thereafter, more than a year after the closing was to have taken place. They and Mrs. Butler entered into a post-judgment settlement and she is no longer a party.

The Association has pursued this appeal. It argues that (1) no discriminatory intent was proved as required under Section 1982, (2) the evidence did not support the finding that the Association violated the Fair Housing Act, and (3) damages were excessive. Because we find Judge Marshall's decision amply supported in fact and law, we affirm except as to actual damages.

## I

The Association's first argument is that intentional racial discrimination was never made out, although it is concededly an essential element of the Phillipses' Section 1982 claim. (Phillips Br. 19–20, 26; cf. *General Building Contractors Assn., Inc. v. Pennsylvania*, —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (intentional discrimination must be demonstrated in a Section 1981 suit; Sections 1981 and 1982 closely related though neither specifically uses intent language)).

### A. Economic defense

The Association goes to considerable lengths to describe its conduct in blocking the proposed sale to the Phillipses as an honest effort to protect property values in the subdivision rather than intentional racial discrimination. To credit this explanation, Judge Marshall would have had to ignore two illogicalities.

First, the Association apparently did not know that Broderick was selling his house for $675,000—less than its estimate of market value.[1] Broderick consistently—if untruthfully—told the Association that he was selling the house for $675,000 in cash and taking the Phillipses' Homewood house, worth $175,000, to boot. That would have made the total package worth $850,000, a figure to which, the Association admits, "no objection of any kind would have been raised" (Br. 14). As late as the date on which the Board voted to sell its first refusal right to Mrs. Butler, Broderick still described the deal in those terms, although he expressed a willingness to forego its advantages if the Board wished (App. 39). Broderick did not admit that there was no side deal about his receiving the Phillipses' Homewood house until the Phillipses' case was called for trial (App. 36).

Second, even if the Board had all along suspected Broderick's veracity, the only

way to protect its notional value of Broderick's property was for the Association to exercise its right to buy the house for $675,000, then hold it until someone offered the desired $850,000. Instead, the Board was prepared to let Mrs. Butler buy the house at the same, allegedly undervalued $675,000 price the Phillipses had offered, plus $10,000, the cost of the Association's option to purchase. This course of conduct raises a powerful inference that price was not the Board's primary concern. To rebut that inference, the Association argues that "the $10,000 could be well-used by the Association" (Br. 8), and that additional, nonmonetary factors made Mrs. Butler's purchase more valuable than the cash price alone would indicate:

> [Mrs. Butler's] father, Paul Butler, was the founder of Oak Brook, and * * * had voluntarily donated a great deal of equipment and shrubbery to the Association. Also, the Butler family owned other lots in Hunter Trails. It was felt that Mrs. Butler's presence in the community would ensure the continued interest of the Butler family in the subdivision. *Id.*

The district judge did not dignify this argument with a detailed refutation. He found, based on substantial evidence, that the Association "was motivated by the race of the Phillips family and the occupation of Mr. Phillips" as the owner of six car-wash establishments (App. 42)—and not by the price that Mrs. Butler would pay for the property (App. 43).

The district judge did not err in finding the Association's economic justifications specious.

### B. Direct evidence of racial animus

Judge Marshall did not rely solely on the economic irrationality of the Association's position. He found numerous indications of unalloyed bigotry. The Association on ap-

---

1. We use the phrase "its estimate" advisedly. The house (and lot) had cost about $530,000–$555,000 (Phillips Br. 10). The Association claims that the house was worth $900,000–$950,000 (Br. 4), an estimate that the plaintiffs challenge (Phillips Br. 10 n.*). Broderick listed the house for $850,000, but told the real estate broker that he would accept $600,000–$700,000 for it. The Association offered no evidence at trial about property values in Hunter Trails generally.

peal tries to explain away all of them, forgetting that as a reviewing court we owe great deference to the district judge's factual conclusions and credibility determinations. The following examples are illustrative.

(1) The Association calls the June 18 meeting "an informal meeting * * * among some of the homeowners" (Br. 17), although it concedes that all but three members of the Board of Directors were present (*id.* at 5). Judge Marshall treated the meeting as official (App. 33).

(2) Judge Marshall found that a number of explicitly racist remarks were made at the meeting (App. 33). The Association argues that the ugly atmosphere was dispelled by two Board members' warnings "that the [Phillipses'] race was totally irrelevant to the discussion and that it would be illegal to refuse them the opportunity to purchase the house on the basis of their race" (Br. 5). Those Board members themselves admitted that their warnings had little, if any, effect (Phillips Br. 15, n.*).

(3) The Association argues that the failure to notify Board member and Association vice-president Broderick of the meeting was inadvertent (Br. 5, 8); Judge Marshall found that it was deliberate (App. 33).

(4) One of the most damning pieces of evidence was a remark by Mr. Stein-bock-Sinclair, the Association's attorney, to a business acquaintance the day after the meeting. Mr. Stein-bock-Sinclair said that Hunter Trails was an exclusive community that did not include "niggers" and "car wash operators." He vowed to use the subdivision's covenants to make certain that the Phillipses did not get the Broderick house. (Tr. 544–549). The Association argues that Mr. Stein-bock-Sinclair's racial remarks cannot be imputed to the Board, either because he did not make them to the Board or because he was not acting within the scope of his agency when he made them (Br. 23–24). By the Association's own admission, however, Mr. Steinbock-Sinclair was the individual it chose to manage the whole effort to block the Phillips sale. He was sent to find out its terms from Broderick (Br. 6), and he and Mrs. Butler's lawyer drafted the assignment to her (Br. 7). Judge Marshall was correct in attaching great significance to Mr. Steinbock-Sinclair's candid statement of the reasons for the Board's actions (App. 43 and 54, n. 3).

(5) The Association has argued that Mrs. Butler's willingness to accept the assignment was a serendipitous event (Br. 7; App. 40–41) but Judge Marshall found (App. 33, 39, 41) to the contrary, and the Association has not convinced us that this was error.[2]

---

**2.** At several points in its brief, the Association claims that Judge Marshall based his finding of intentional discrimination on evidence he had earlier excluded. See, *e.g.*, Br. 9–10, 18, 20, 29. This accusation is unfounded.

The district judge excluded the contents of several threatening phone calls because they could not be authenticated; the fact that phone calls had been received was not excluded (App. 32; Tr. 124, 126). Furthermore, the judge left open the possibility that even anonymous declarations could be received if they were relevant to the state of mind of the defendants (Tr. 121), and that is the only use to which any of the telephone evidence was put in the final opinion (App. 32).

The Association also points to Tr. 418–420, a colloquy triggered by plaintiffs' counsel's ask-ing Mr. Broderick if his neighbors exhibited hostility to him after he agreed to sell his house to the Phillipses. The judge was worried about relevance and did not want to turn the trial into a generalized indictment of Oak Brook. He did initially compare the Association's responsibility for individual acts of racism to General Motors' responsibility for the actions of a small shareholder. The defendant could not have been prejudiced by this discussion, because the judge clearly stated his ultimate position: "What you have demonstrated very adroitly, Mr. Caruso [counsel for the Phillipses], * * * is that there is an old saying that analogy is a lazy way of reasoning, and you have demonstrated the laziness of my reasoning. I stick by my ruling [that the particular question to Broderick is objectionable] but I withdraw the General Motors analogy." Tr. 432A.

This Court will not second-guess the district judge on any of these matters. Together they are based on credibility assessments and create a clear picture of intentional racial discrimination by the appellant Association.

C. The applicable legal standard

The Association claims that Judge Marshall used an unprecedented standard, involving both race and occupation, to find discrimination. They point to this passage in the district judge's opinion:

> [A]n American Negro car wash operator was not acceptable to the owners in Hunter Trails. Steinbock-Sinclair capsulized the prevailing attitude when he said * * * that Hunter Trails was a community of professionals and was not the place for a "nigger car wash operator." App. 42–43

What the Association neglects to mention is that the district judge was responding to their arguments that Hunter Trails was a racially and occupationally diverse neighborhood. On appeal they sound the same themes: "At least one other black family already lives [in Hunter Trails], as well as several other families of similar racial characteristics,[3] and members of other minority groups," and a broad range of occupations is represented in the subdivision—"builders, grain brokers, engineers, owners of dry cleaning establishments, owners of electronic stores, salesmen of household cookware, and a barber * * *" (Br. 3). Neither at trial nor on appeal, however, could the Association demonstrate any overlap between minority race and non-professional occupation. Judge Marshall's statement is simply a recognition that if the Association would

approve a white purchaser who owned dry cleaning establishments, but veto a black man who owned a chain of car washes, its decision can only be based on race.

■ Our conclusion is that the evidence was ample to sustain the judgment in favor of the Phillipses and against the Association under 42 U.S.C. § 1982.

## II

The Association's second argument is that the evidence was not sufficient to support a finding that the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, was violated. As a strategic matter, this argument would only help the Association if we had reversed the Section 1982 judgment, which we have refused to do. We address the issue nonetheless in order to clarify the defendant's confused understanding of how our second *Arlington Heights* opinion, 558 F.2d 1283 (7th Cir. 1977), certiorari denied, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 fits into Fair Housing Act jurisprudence.

Some Fair Housing Act complaints do not arise out of discrete real estate transactions. Rather they arise in a broader context, when a facially neutral policy or action has an unequal impact on different subgroups in the housing market. The question in *Arlington Heights* II was what the plaintiff had to show to make out a violation in such a "disparate impact" or "discriminatory effect" case. This Court held that statistical disproportion alone was not enough, but neither did a plaintiff have to prove discriminatory intent to succeed on his purely statutory claim.[4] We deemed four factors of critical importance: (1) the

---

In his decision, the judge relied only on specific remarks made by the participants in the June 18 meeting and by Steinbock-Sinclair the next day. That reliance is not inconsistent with his attitude and rulings during the trial.

**3.** The Association evidently has a restrictive definition of white and an expansive definition of black. Asked at oral argument if any members of the Board of Directors were black, counsel for the Association replied, "One of the members of the Board is a dark-skinned gentleman from South America."

**4.** In *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, the Supreme Court had held that a suit based on denial of equal protection required either a showing of such disproportionate impact that the only inference possible was intentional discrimination (*id.* at 266, 97 S.Ct. at 563) or direct or circumstantial evidence of discriminatory intent (*id.* at 267–268, 97 S.Ct. at 564–565). It left open the kind and amount of evidence needed to make out a Fair Housing Act violation.

strength of the plaintiff's statistical showing; (2) the legitimacy of the defendant's interest in taking the action complained of; (3) some indication—which might be suggestive rather than conclusive—of discriminatory intent; and (4) the extent to which relief could be obtained by limiting interference by, rather than requiring positive remedial measures of, the defendant. 558 F.2d at 1290; each factor is separately discussed at 1290–1293.

 The Association chides the district judge for not making explicit findings for each of the *Arlington Heights* II factors (Br. 30). In fact this was never an *Arlington Heights* case. The Phillipses complained of discriminatory intent, not of facially neutral actions that harmed blacks more than whites. To make out their *prima facie* case under the Fair Housing Act, they had only to show that they were black, that they applied for and were qualified to buy the Broderick house, that they were rejected, and that the Broderick house remained on the market. *Robinson v. 12 Lofts Realty*, 610 F.2d 1032, 1038 (2d Cir. 1979). They clearly made that showing. Then the burden shifted to the defendant to articulate nonracial reasons for its actions. *Id.* at 1039. The Association—equally clearly—did not succeed. The Phillipses were as much entitled to their judgment under the Fair Housing Act as under Section 1982.

### III

The Association's last line of attack is that the damages awarded by the district court were too generous. The defendant does not contest that portion of the award ($2,675) that represents the Phillipses' out-of-pocket expenses—the cost of the unnecessary move and of storing furniture. The Association does object to the award of $25,000 each to Mr. and Mrs. Phillips for humiliation and embarrassment[5] and to the assessment of $50,000 punitive damages for

each plaintiff.[6] We agree that the compensatory damages must be reduced but we affirm the district judge's award of punitive damages.

### A. Compensatory damages

 Injuries like the Phillipses' are by their nature difficult to prove. A reviewing court will not demand more precision than is feasible, *Crumble v. Blumthal*, 549 F.2d 462, 467 (7th Cir. 1977) (extent of intangible harms may be established by testimony of the plaintiff); *Seaton v. Sky Realty Company, Inc.*, 491 F.2d 634, 636 (7th Cir. 1974) (humiliation can reasonably be inferred from circumstances). Furthermore, when a judge functions as the trier of fact, as Judge Marshall did here, his estimate of damages for intangible injuries is subject to the "clearly erroneous" rule. Nonetheless we have the "definite and firm conviction that a mistake has been committed." *Busche v. Burkee*, 649 F.2d 509, 518 (7th Cir. 1981), certiorari denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 1147.

The district judge rested his award of damages for mental and emotional distress on the testimony and demeanor of the Phillipses (App. 47 and n.3). That is an inadequate basis for an award that is more than twice as much as any other victim of housing discrimination has received for intangible injuries, judging from the parties' submissions and our own research. See *Parker v. Shonfeld*, 409 F.Supp. 876 (N.D.Cal.1976) ($10,000 for humiliation and embarrassment). In this Circuit damages for the intangible injuries of victims of housing discrimination have ranged between $500 and $5,000. It is no answer to such disparity to argue, as appellees do, that "much has been learned [recently] about the damaging effects of discrimination in housing" (Br.

---

5. Until she settled, the Association had joint and several liability for this amount with Mrs. Butler; now the Association is the sole defendant (Phillips Br. 3, n. **; Association Reply Br.

16) and objects to paying this amount as excessive (Association Br. 31, Reply Br. 11–13).

6. The Association's liability for this amount is not joint and several.

32). The district judge did not rely on new-found knowledge.

We have the impression that two factors influenced the district judge. First, the typical housing discrimination case does not involve a $675,000 home. But that is irrelevant to the Phillipses' intangible injuries: the anger and hurt do not correlate with the wealth of the victim or the price of the property. Second, the conduct of the Association was egregious. But that is reflected in the punitive damage assessment. We therefore direct the district court to reduce the compensatory damages to $10,000 for each plaintiff in addition to their actual expenditures of $2,675.

B. Punitive damages

■ We do not disturb the punitive damage award. As noted, this is the place where the willfulness of the Association's conduct is appropriately weighed. The record contains ample evidence of intentional disregard of the Phillipses' rights, and the district judge gave careful consideration to the Association's financial position as well. He noted that it had a bank balance of $100,000, cash flow from assessments of $142,000 a year, and the ability to raise money by additional assessments if necessary—a course it would have had to follow if it had exercised its first refusal rights on the Broderick property in a nondiscriminatory way (App. 50). The Association's arguments—that "the punitive award will take all of the Association's funds and leave nothing to enable it to carry out its obligations to its members" and that "the effect of this award is not merely to punish the Association but to destroy it" (Br. 33)—are counterfactual. Undoubtedly the punitive damages will cause the Association some hardship, but that is an essential part of their deterrent function.

In addition to its quarrel with the amount of punitive damages, the Association has two theories about why, as a matter of law,

they should be unavailable. The first is that Section 3612(c) of the Fair Housing Act should restrict punitive damages to a token $1,000. There is some ambiguity about whether the ceiling in that Section applies to all suits brought under the Fair Housing Act, or only to suits brought under Sections 3603, 3604, 3605, and 3606.[7] We need not resolve the issue, however, because there is no limit on the amount of punitive damages that can be awarded under 42 U.S.C. § 1982, the other prong of this case.

■ The Association's second argument is directed against punitive damages under Section 1982. It seeks to clothe itself in absolute immunity under the following syllogism. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 prohibits punitive damages against municipalities under Section 1983. *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 is authority for treating the Hunter Trails Community Association as a municipality. Therefore, Hunter Trails cannot be liable for punitive damages under Section 1982. Whatever the merits of this argument (and they seem doubtful), the defendant never raised it in the district court. It is therefore not properly before us on appeal, *Ed Houser Enterprises v. General Motors Corp.,* 595 F.2d 366, 371 (7th Cir. 1978).

The district court's finding of liability and its award of punitive damages are affirmed; its award of compensatory damages is vacated and remanded for further proceedings consistent with the direction expressed in this opinion. Costs to appellees.

---

7. The ambiguity has arisen because some courts have held that the statute of limitations, which is contained in Section 3612(a), is so limited. See, *e.g., Smith v. Stechel,* 510 F.2d 1162 (9th Cir. 1975). This Circuit has not decided the question: *Arlington Heights* II, *supra,* 558 F.2d at 1287, n. 4. The Phillipses' suit was brought under Sections 3604 and 3617 (App. 6).