Roberto **RODRIGUEZ**, et al., Plaintiffs,

v.

Biagio **GATTUSO**, et al., Defendants.

No. 89 C 6151.

United States District Court, N.D. Illinois, E.D.

May 29, 1992.

Ramon Muniz, Chicago, Ill., for plaintiffs.

William E. Dicks, Jr., Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

Roberto ("Roberto") and Carol ("Carol") Rodriguez (collectively "Rodriguezes") have sued Biagio ("Biagio") and Carmela ("Carmela") Gattuso (collectively "Gattusos"), charging them with housing discrimination in violation of 42 U.S.C. §§ 1982 and 3604(b).[1] This Court has conducted a bench trial of the issues after having vacated a default judgment that had previously been entered in favor of Rodriguezes, and counsel for the parties have submitted proposed findings of fact ("Findings") and con-

clusions of law ("Conclusions") both pretrial and posttrial.

In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court finds the facts specially as set out in the following Findings and states its conclusions of law separately as set out in the following Conclusions. To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

### Findings of Fact [2]

1. Gattusos own and manage two six-apartment buildings, one located at 3810 N. Harlem Avenue, Chicago (owned by them since 1974) and the other located at 6744 W. Diversey Street, Chicago (owned by them since 1965). Both buildings' apartment units are offered for rent by Gattusos from time to time.

2. Roberto is a United States citizen of black Latino ancestry, while his wife Carol is a United States citizen of white Latino ancestry. In physical appearance Carol is light-skinned, while Roberto's dark skin obviously reflects his ancestry. To anyone to whom color makes a difference, the distinction between Roberto's color on the one hand and Carol's (or that of any other "white" person) on the other may well be perceived as one of kind rather than degree.

---

1. Further citations to the provisions of Title 42 will simply take the form "Section—."

2. This action presents a classic instance of totally conflicting versions of the relevant events, as testified to by the opposing parties. In any such situation, where there is consequently a need to resolve issues of the parties' relative credibility, courts regularly look to confirmatory evidence on one side or the other—objective non-testimonial evidence, or testimony from persons lacking the degree of bias and interest possessed by the parties themselves, or both. In this instance the confirmatory evidence strongly favored Rodriguezes, most particularly (1) the improbability of the story told by Biagio about the unnamed (and unnameable) other purported

prospective tenant (see Finding 6 & n. 4) and (2) the testimony of Josephine Bustamante ("Josephine") as to the observed reaction of Gattusos when they unexpectedly saw the dark-skinned Roberto (Gattusos having previously offered no objections to the light-skinned Carol's leasing the apartment in question, but having told her that they believed they had to meet her husband and get a lease application first). Although Josephine's testimony (like that of all the witnesses) did involve some inconsistencies on minor issues, on the critical issue described in the preceding sentence it was consistent, entirely corroborative of the Rodriguezes' version and wholly credible.

3. Since 1965 only one family of white Latino ancestry has been a tenant in each of Gattusos' buildings. No family of black Latino ancestry has been a tenant in either building.

4. In May 1989,[3] after their house had been put up for sale, Rodriguezes were looking for an apartment to rent. On May 19 Roberto ran into his friend Mitchell Gonzalez ("Gonzalez," a light-skinned person of Latino ancestry) at the Harlem–Irving Park Mall, where Gonzalez was purchasing the rings for his wedding the following day. Knowing that Roberto and his wife were looking for an apartment, Gonzalez informed Roberto of a vacancy at 3810 N. Harlem, where he and his fiancee Laura Borges (also a light-skinned person of Latino ancestry) had just recently rented the apartment that they would occupy after their marriage.

5. On the evening of that same day (May 19) Roberto telephoned Gattusos and was given an appointment by Carmela to see the available apartment at 4 p.m. the following day.

6. On May 20 Roberto arrived at 3810 N. Harlem about 3:40 or 3:45 p.m. and waited outside in his car for about 10 to 15 minutes, after which he stood in front of the building at 4 p.m., the time set for his appointment. At that time he saw Carmela peering out from behind the building. Roberto then proceeded to the rear of the building, where he found Carmela and Biagio (who was standing on a ladder working on a window of the first floor apartment). Carmela was standing by the ladder as Roberto approached and identified himself as the person to whom she had given an appointment. Gattusos responded by telling Roberto that they were sorry but that Biagio had already accepted a $100 security

deposit from a gentleman who was interested in renting the unit. They explained Carmela's having given Roberto the appointment to see the apartment on the basis that Biagio had not told his wife about the alleged other gentleman or about his having assertedly given Biagio $100 (an explanation that of itself strains credulity). At the trial Gattusos were unable to name that alleged person, nor did Biagio claim to have given him a receipt or to have requested or obtained any personal information about him (even his name, let alone his address or telephone number).[4] After admonishing Gattusos for letting him wait for so long before telling him that the unit was no longer available, Roberto left.

7. On the following day (May 21) Roberto asked Carol to call again to verify that the apartment was in fact rented out. Carol (not identifying herself as Roberto's wife) called and was told—in direct contravention of the story that Gattusos had given Roberto the day before—that the unit was indeed available for rent. She was given an appointment to see the apartment at 7 p.m. the following day, May 22.

8. On May 22 Carol arrived at 3810 N. Harlem at 7 p.m. and was greeted by Gattusos, who proceeded to show her the apartment and to explain to her that the rent was $535 per month, with two months' security deposit. After Carol told Gattusos that she liked the apartment and had the money with her to secure the unit, Gattusos rejected the money and told her that they first had to meet her husband and would want them to fill out a lease application. Gattusos gave an appointment to Carol and her husband (whom Gattusos thought they had not yet met) for the following day, May 23.

3. All relevant events in this case took place in May 1989. Accordingly, no further year designations will be included in these Findings. As for the specific dates involved, May 19 was a Friday, May 20 a Saturday, May 21 a Sunday, May 22 a Monday and May 23 a Tuesday.

4. Not only does this Court discredit Biagio's testimony as to the existence of that alleged person as well as his cover story about not having told Carmela about it, but it finds that his assertions in that respect both (1) confirm

his bias against renting to a person of "color" such as Roberto and (2) damage his credibility generally. As for Carmela, although her involvement in the color-discriminatory conduct renders her fully culpable as a joint participant with Biagio, this Court's sense of the evidence is that she was somewhat more passive—perhaps following her husband's lead—so as to lessen (but not altogether extinguish) her liability for punitive damages. More on this subject later.

9. On May 23 Carol, Roberto and their friend who had accompanied them, Josephine, arrived at 3810 N. Harlem at 7 p.m. Carol got out of the car to wait for Gattusos, while Roberto and Josephine briefly remained inside the car. When Gattusos appeared, they and Carol approached each other and proceeded to converse briefly in a friendly and amiable manner while Roberto and Josephine were still in the car and were then getting out. Both Roberto and Josephine saw Biagio show a manila folder to Carol with a document or documents inside.[5] Then when Gattusos saw the dark-skinned Roberto, Biagio looked startled—as though he had "seen a ghost" (sic). Suddenly the prior civil conversation that had been carried on between Gattusos and Carol became totally different. Both Gattusos reacted in an excited and nervous manner, offering several excuses that were inconsistent with their earlier indications to Carol of the apartment's availability: that there were two other couples ahead of the Rodriguezes, that the apartment wouldn't be ready for another few weeks, and then—when Roberto said that Rodriguezes wouldn't mind waiting two or three weeks—that Gattusos didn't know if Rodriguezes could pay the rent.[6] Because it was obvious that Gattusos were unwilling to rent the apartment to Rodriguezes, Roberto said "Let's go," and both Rodriguezes and Josephine left.

10. On both occasions, May 22 and May 23, light-skinned-Latino Carol was treated respectfully and with no apparent objection on Gattusos' part to the availability of the apartment for her. In total contrast, dark-skinned-Latino Roberto was told on May 20 that even though Carmela had given him an appointment, the apartment was not in fact available because somebody else had given Biagio a security deposit—a claimed incident in which the individual did not even leave his name or address or telephone number, let alone signing a lease application, but allegedly simply gave Biagio $100 in cash.[7] Again in total contrast, Roberto was rejected a second time when he appeared with Carol and Josephine on May 23. It must be concluded that Roberto Rodriguez was not shown the unit, and was given various excuses for not showing it to him, because he is a black Latino.

11. Neither of the Rodriguezes offered proof of any out-of-pocket damages by reason of Gattusos' discriminatory conduct. Roberto felt humiliated and hurt on May 20 by the actions of Gattusos in lying to him about the unavailability of the apartment and in breaking the appointment that Carmela had made to show it to him. Far more significantly, Roberto suffered further humiliation and hurt when he saw Gattusos' demeanor change so dramatically from that which was being presented to his wife when he approached Gattusos on May 23. Carol likewise suffered the pain and humiliation to which her husband was being subjected. Both Rodriguezes found the incident embarrassing and demeaning (Roberto said it made him "feel one foot tall" to know that they didn't want "someone like me, a dark person, living in the area").[8]

---

5. There has been a dispute between the parties as to whether Gattusos did or did not regularly require prospective tenants to sign applications for leases before accepting them as tenants, and relatedly as to what were the contents of the manila folder referred to in this Finding. Those areas of dispute are irrelevant, given the facts (1) that Rodriguezes would have been willing to comply with any lease application requirements (they had previously filled out credit applications and mortgage applications, which had been approved) and (2) that the entire process was frustrated by Gattusos' total change of attitude and assertion of a series of excuses as soon as they saw the dark-skinned Roberto (an attitude that manifested itself on *both* occasions when Gattusos encountered him).

6. After Roberto appeared on the scene, Gattusos had also spoken with each other briefly in another language—presumably Italian—that none of Carol, Roberto and Josephine understood. Although this Court obviously cannot make an express finding as to what was said in that conversation, the reasonable inference is that Gattusos were discussing what cover stories to give Rodriguezes as to why they could not have the apartment.

7. As already stated at n. 4, this Court does not credit that story.

8. Gattusos offered evidence that they currently have one black living in one of the apartments in the 3810 N. Harlem Avenue building. However, that person is the four-year-old daughter

12. This Court has considered the actual damages to be awarded to Rodriguezes for their intangible harms, as well as the punitive damages to be awarded to them, in light of the relevant case law (including particularly the *Phillips, Hamilton* and *Douglas* decisions cited and discussed in Conclusion 6, taking full account of the amounts respectively disapproved and approved by our Court of Appeals in *Phillips,* the amounts more recently approved by it in *Hamilton,* and then most recently the amounts respectively disapproved and approved by it in *Douglas* ). This Court finds that the pain and humiliation suffered by Rodriguezes, though meaningful, calls for a substantially lesser compensatory damage award than the amount awarded in response to the similar discrimination involved in *Hamilton*—an amount that was said in that case to be "very close to being excessive" (*Hamilton,* 779 F.2d at 389).[9] This Court also finds that the discriminatory conduct by both Gattusos in rejecting Roberto as a prospective tenant at sight was wilful and wanton and undertaken with a purposeful discriminatory intent (see Conclusion 6), thus justifying an award of punitive damages (*id.*). Accordingly the following amounts are awarded on the respective claims (the same award is being made under both Section 1982 and Section 3604(b)): [10]

(a) Roberto is awarded an aggregate of $6,000 in actual damages jointly and severally against Gattusos.

(b) Carol is awarded an aggregate of $4,000 in actual damages jointly and severally against Gattusos.

(c) Roberto is awarded $3,000 in punitive damages against Biagio and $1,500 in punitive damages against the less culpable Carmela.

(d) Carol is awarded $2,000 in punitive damages against Biagio and $1,000 in punitive damages against Carmela.

### Conclusions of Law

1. This Court has jurisdiction of this action to entertain and enforce claims under Sections 1982 and 3604(b). District court jurisdiction for enforcement of Section 1982 (one of the immediately post-Civil-War civil rights statutes) is conferred by 28 U.S.C. § 1343(a)(3), while such jurisdiction for enforcement of Sections 3601 to 3619 (the Fair Housing Act of 1968, enacted almost exactly a century later than Section 1982) is conferred by Section 3612.

2. Section 1982 speaks of the "right ... to ... lease ... real ... property," a definition satisfied by the apartment that Rodriguezes were seeking to lease from Gattusos. Section 3602(b), in the definitional section of the Fair Housing Act, speaks of "any building ... or portion thereof which

---

of a white couple (the wife had previously been married to a black man, and the little girl was born to that marriage). This Court finds that highly different situation to be entirely nonprobative on the issue of discriminatory conduct here. It may also be noted that the couple in question had moved into the apartment less than a month before the trial in this case, so that the evidence of such recent conduct in the *context of this lawsuit is of doubtful admissibility* (let alone of probative force) on the issue of Gattusos' intent three years ago.

9. *Douglas'* damage award is a bit more difficult than *Hamilton 's* to extrapolate to this case, in light of the other factors that were present in *Douglas.* That case too involved only intangible injuries (like *Hamilton* and this case, and unlike *Phillips*). But the Court of Appeals' reduction of the compensatory damages award in *Douglas* to $10,000 ($2,500 for each of the four family members there) must be understood in the context of those plaintiffs having already received $13,000 in settlement from the apartment own-

er, thus generating for them a total recovery of $23,000 in compensatory damages. This Finding's award of an aggregate of $10,000 in such actual damages to Rodriguezes is wholly in line with that result and is also substantially less than the awards of $10,000 *per plaintiff* in the several cases cited by *Hamilton,* 779 F.2d at 389, with apparent approval.

10. There was no quantified proof of Gattusos' financial condition presented at the trial, as is normally required to determine how much of an award by way of punitive damages will serve the appropriate purposes of punishment and deterrence (*Hamilton,* 779 F.2d at 389), without at the same time creating undue hardship or even threatening defendants' economic viability (*Phillips,* 685 F.2d at 191). But clearly the modest amounts awarded here create *no such risk to* persons such as Gattusos, who have acquired ownership of the two six-flats referred to in Finding 1, supplementing Biagio's earnings from his job.

is ... intended for occupancy as a residence by one or more families ...," a definition also satisfied by the same apartment.

■ 3. Section 1982 guarantees that all citizens shall have "the same right" to lease real property "as is enjoyed by white citizens." Section 3604(b) makes it "unlawful ... [t]o discriminate against any person in the terms, conditions or privileges of ... rental of a dwelling, ... because of race, color, religion, sex, or national origin." Most often "race" and "color" discrimination are viewed as synonymous, just as the term "white citizens" is most often contrasted with "black citizens"—a racial distinction. But the very inclusion of "color" as a separate term in addition to "race" in Section 3604(b) implies strongly that someone who is of the same race ("race" used in the ethnic sense, not the broader sense announced in *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609–13, 107 S.Ct. 2022, 2026–28, 95 L.Ed.2d 582 (1987) as the 19th century understanding of that term) but who is treated differently because of his dark skin has been discriminated against because of his *color*—something expressly forbidden by Section 3604(b). And a citizen such as Roberto, who has been treated differently in the leasing of real property because of the color of his skin, has by reason of that treatment not been permitted to enjoy the same right as "white citizens"—something expressly forbidden by Section 1982.

4. Conclusion 3's common-sense and internally logical reading of the statutes at issue here conforms to the reading given a decade ago to the parallel Title VII prohibition against employment discrimination on account of "color" as well as "race" in *Felix v. Marquez*, 27 Empl.Prac.Dec. (CCH) ¶ 32,241 (D.D.C.1981). There District Judge Pratt, dealing with a plaintiff of identical racial characteristics to Roberto's (a Puerto Rican with mixed racial ancestry), ruled against that plaintiff on the mer-

its but held in the respect relevant here (*id.* at 22,767 and 22,769 (citations omitted)):

> This case presents, for perhaps the first time in a federal court, an allegation of color discrimination that is not subordinated to a more familiar claim of racial discrimination. Discrimination on account of color is expressly forbidden by the 1964 Civil Rights Act, not only in Title VII (employment), but also in Titles II (public accommodations), III (public facilities), IV (public education), VI (federally assisted programs), VIII (voting) and IX (community relations services).[11] Color is a rare claim, but considering the mixture of races and ancestral national origins in Puerto Rico, it can be an appropriate claim for a Puerto Rican to present.

> 11 In 1870, the Fifteenth Amendment to the United States Constitution proscribed the denial or abridgement of a citizen's right to vote on account of "race, color, or previous condition of servitude." Since that time, the same proscription, modified by the deletion of "previous condition of servitude" and, often, by the addition of "creed," has been written into numerous federal laws and Executive Orders enacted to protect individual civil rights. Although the legislative history of these acts is silent on the meaning of the term "color," and no definitive interpretation has been provided by the courts, this court is constrained to believe that "color" is a particularly appropriate term in the context of this case involving a person from Puerto Rico with a mixed racial ancestry.

5. Though there were cases from the pre–1987 period that had expressed a different view as to the prohibitions under Section 1981, they have since been discredited by the expansive concept of "racial" discrimination articulated in *St. Francis College*. That is the conclusion reached in *Walker v. Secretary of the Treasury*, 713 F.Supp. 403, 405–07 (N.D.Ga.1989), an extended and thoughtful discussion by Senior District Judge Moye from which a like ruling in this case really flows a fortiori. This Court sees no reason to repeat what is said there (an opinion that should be read to be appreciated fully), and it reaches the identical conclusion for purposes of this case.[11]

---

**11.** Originally Rodriguezes' counsel had characterized their claim as one of discrimination against persons of "Latino origin," a claim that would fail for lack of proof because of Gattusos'

rental of an apartment to the Gonzalez couple while almost contemporaneously refusing one to Roberto. But the claim of *color* discrimination against Roberto is more than well sup-

6. Absent any proof of out-of-pocket damages, both Roberto and Carol are relegated to recovery for the intangible harm that they have suffered and for possible punitive damages as well. In the latter respect, this Court finds Gattusos to have acted with a purposeful discriminatory intent (see *St. Francis College*, 481 U.S. at 613, 107 S.Ct. at 2028 and the more extended discussion of such intent in *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529–30 (7th Cir.1990)). Gattusos' fabricated version of events as well as the deliberately discriminatory treatment of Roberto that was evinced by Biagio, in which Carmela concurred (though as a less overt participant), supports the conclusion that both of them acted wantonly and wilfully as well as with the already-mentioned purposeful discriminatory intent. Those factors entitle Rodriguezes to recover both compensatory and punitive damages (for our Court of Appeals' opinions dealing with damages issues and their quantification in housing discrimination cases, see *Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 190–91 (7th Cir.1982); *Hamilton v. Svatik*, 779 F.2d 383, 388–89 (7th Cir.1985); and *Douglas v. Metro Rental Services, Inc.*, 827 F.2d 252, 256–57 (7th Cir.1987)). As to the non-joint-and-several liability for punitive damages, Biagio appears from the evidence to have been more culpable than Carmela, and the awards in Finding 12 reflect that.

\*　　\*　　\*

This Court orders that judgment be entered in favor of plaintiffs Roberto and Carol Rodriguez and against defendants Biagio and Carmela Gattuso in the following amounts, together with costs under Rule 54(d):

(a) Roberto is awarded an aggregate of $6,000 in actual damages jointly and severally against Gattusos.

(b) Carol is awarded an aggregate of $4,000 in actual damages jointly and severally against Gattusos.

(c) Roberto is awarded $3,000 in punitive damages against Biagio and $1,500 in punitive damages against Carmela.

(d) Carol is awarded $2,000 in punitive damages against Biagio and $1,000 in punitive damages against Carmela.

Because the finality of such a judgment is not impaired by the added availability of an attorneys' fee award in Rodriguezes' favor (see *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 201–02, 108 S.Ct. 1717, 1721–22, 100 L.Ed.2d 178 (1988)) this order is for entry of a final judgment in this action.

ported. This Court's physical observation of light-skinned Latino Mitchell Gonzalez (whose wife Laura was described as "white") and of light-skinned Latino Carol, as contrasted with Roberto's characterization as a "black Latino," demonstrates graphically that persons such as Gattusos could be (and in this case were) biased against Roberto *because of* his color and that Gattusos discriminated against him for that reason and that reason alone.