Alfred E. LIPPMAN, Plaintiff/Appellant,

v.

BRIDGECREST ESTATES I UNIT OWNERS ASSOCIATION, INC., et al., Defendants/Respondents.

No. 72762.

Missouri Court of Appeals, Eastern District, Division Three.

Sept. 1, 1998.

Sanford J. Boxerman, Rosenblum, St. Louis, for appellant.

Martin L. Daesch, Anthony J. Soukenik, St. Louis, for respondents.

AHRENS, Judge.

Plaintiff Alfred E. Lippman appeals from the trial court's denial of a permanent injunction enjoining Bridgecrest Estates I Unit Owners Association, Inc., et al., (hereinafter "Bridgecrest"),[1] from exercising a right of first refusal; from the trial court's order granting Bridgecrest's crossclaim for specific performance of the contract contemplated by the right of first refusal; from the trial court's award of damages against Mr. Lippman for clouding title to the real property at issue; and from the trial court's award of damages assessed against a temporary restraining order (TRO) bond to Bridgecrest. We reverse.

The case before us is not the first litigation between Mr. Lippman and the parties representing Bridgecrest. In *Coy v. Lippman,* Case No. 675074 in the Circuit Court of St. Louis County, Bridgecrest unsuccessfully challenged Mr. Lippman's right to lease Bridgecrest units that he owned as of 1995. The current litigation arises from Mr. Lippman's subsequent efforts to purchase another Bridgecrest condominium for leasing purposes and Bridgecrest's efforts to purchase the same condomium under a right of first refusal. The dispute is grounded in Bridgecrest's intention to serve as housing for older persons and Mr. Lippman's intention to lease his Bridgecrest units to persons regardless of their age.

In 1969, Bridgecrest filed its first Declaration of Condomium and By–Laws which included Article 8.1 restricting occupancy to persons 52 years of age or older.[2] In 1986, Bridgecrest filed a first amended declaration but left the age restriction unchanged. In 1990, Bridgecrest received a letter from the U.S. Department of Housing and Urban Development (H.U.D.) that indicated its age restriction would violate the Fair Housing Act, 42 U.S.C. Sections 3601–3631, unless Bridgecrest could show that it met these three requirements: (1) Bridgecrest offered significant facilities and services specifically designed to meet the physical or social needs of older persons; (2) at least 80% of the units were occupied by at least one person 55 years of age or older per unit; and (3) publication

---

1. Evelyn Klass, seller of the Bridgecrest property at issue and Robert Klass, her son and power of attorney, were also named as defendants in Mr. Lippman's 2/28/97 petition for a temporary restraining order, preliminary injunction and permanent injunction.. Bridgecrest's answer included a crossclaim for specific performance against the Klasses and a counterclaim against Mr. Lippman for damages incurred by virtue of Mr. Lippman's clouding title to the Klass unit. The Klasses failed to appear and filed no response to Bridgecrest's crossclaim for specific performance. Investors Title Company, Inc., was also named as an original defendant.

2. Article 8.1 of the 1986 amended declaration read, " No part of any unit shall be used for a purpose other than single family residences, each unit being occupied as a residence, either by one (1) family or by not more than three (3) unmarried individuals of the same sex, and said residents shall be fifty-two (52) years of age or older, provided that either a husband or wife may be under said age and children of the …family may be residents if they are eighteen (18) years of age or older, said individuals subject to approval of the association board."

of, and adherence to, policies and procedures which demonstrated an intent by the owner or manager to provide housing for persons aged 55 or older. Bridgecrest determined that it lacked sufficient funds to meet the "significant facilities and services" requirement and on July 24, 1991, recorded a third amended declaration which deleted the age restriction in Article 8.1.[3] In January 1992, Bridgecrest amended the declarations a fourth time and did not reinstate the age restriction. Although Congress amended the Fair Housing Act to allow housing communities to impose age restrictions without having to provide "significant facilities or services" in 1995, Bridgecrest did not amend its declarations to reinstate an age restriction.

Also included in Bridgecrest's 1969 original declaration and subsequent amendments is Article 15.1 which grants Bridgecrest a right of first refusal should the owner of any Bridgecrest unit desire to sell. Article 15.1, at the time of the events leading to this litigation, read "If any unit owner desires to sell his unit, that owner shall give the association the first right and option to purchase the unit. If the association does not exercise its right to purchase the unit within forty-five (45) days after the receipt of said notice, the owner may sell the unit."

In January 1997, Mr. Lippman entered into a contract to purchase a Bridgecrest unit for $22,000 from Evelyn Klass through Robert Klass, her son and power of attorney. On February 6, 1997, Mr. Lippman delivered a copy of the Klass contract to Bridgecrest's property manager, as per Section 15.1 of Bridgecrest's declaration. The manager, on authority from the association board, told Mr. Lippman that if he would agree to abide by Bridgecrest's age restriction, Bridgecrest would not exercise its right of first refusal. After Mr. Lippman replied that he would

not abide by the age restriction, the association board voted to exercise the right of first refusal and purchase the Klass unit. At trial, two board members testified that their sole reason for exercising the right of first refusal was to stop Mr. Lippman from leasing the unit to someone who did not meet the age restriction. On February 20, 1997, Bridgecrest and Robert Klass signed a sales contract for the Klass unit which set February 26, 1997 as the closing date. Because Mr. Klass was out-of-town, the closing was postponed to February 28, 1997.

On February 28, 1997, Mr. Lippman filed a petition for a TRO, preliminary injunction, and permanent injunction to halt the sale of the Klass unit to Bridgecrest. On February 28, 1997, the circuit court issued a TRO to enjoin transfer of the Klass unit. The TRO was to remain in full force and effect until March 10, 1997, the day of the hearing on the preliminary injunction. At the court's direction, Mr. Lippman posted a $10,000 bond on February 28, 1997.

On March 18, 1997, based on evidence from the March 10 hearing, the trial court denied Mr. Lippman's petition for preliminary injunction, purported to formally dissolve the TRO, and assessed $3,791.25 in attorney's fees as damages against Mr. Lippman's posted bond. On March 25, 1997, forty-seven days after notifying Bridgecrest of his intended purchase of the Klass unit, Mr. Lippman filed a notice of lis pendens to put all potential transferees of the Klass unit on notice with respect to the civil action still pending from his February 28, 1997 petition for a permanent injunction. On April 7, 1997, Robert Klass and Mr. Lippman met for the purpose of closing on the Klass unit but did not do so because the title company had received a letter from Bridgecrest indicating the purchase would interfere with the contract between Bridgecrest and the Klasses. On

3. The third amended declaration refers to a second amended declaration which is not included in the record on appeal.

April 18, 1997, the Klasses, by general warranty deed, conveyed the Klass unit to Mr. Lippman.

On May 19, 1997, the trial court denied Mr. Lippman's petition for a permanent injunction to enjoin the sale of the Klass unit to Bridgecrest; awarded Bridgecrest attorney fees of $2,756.25 incurred between March 10 and March 18 to remove the restraint imposed by the TRO; ordered the Klasses to specifically perform their contract with Bridgecrest or, if they could not convey title, ordered Mr. Lippman to convey the unit to Bridgecrest for the same purchase price; and awarded $2,095.35 to Bridgecrest in damages incurred by virtue of Mr. Lippman's clouding title to the Klass unit.

Mr. Lippman appeals from the trial court's judgment. He argues that Bridgecrest's attempted exercise of its right of first refusal was illegal and improperly motivated because Bridgecrest's sole purpose in exercising the right was to prevent Mr. Lippman from leasing the Klass unit to persons under the age of 52. Mr. Lippman further argues that Bridgecrest does not qualify for an exemption under the Fair Housing Act, 42 U.S.C Sections 3607–3631, and cannot use the right of first refusal to discriminate on the basis of familial status. Mr. Lippman claims that if he is unable to purchase the Klass unit, as per the April 18th contract, he will suffer irreparable economic harm.

We consider three issues: (1) whether Bridgecrest's exercise of its right of first refusal violated the Fair Housing Act, 42 U.S.C., Sections 3604 and 3607; (2) whether Mr. Lippman's filing of the lis pendens is absolutely privileged; and (3) and whether Bridgecrest is entitled to attorney's fees assessed against the TRO bond.

In a court tried case, we will affirm the trial court's judgment unless "there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.

banc 1976); Rule 73.01(c). Because the trial court erroneously applied the law, we reverse.

## I. The Right of First Refusal

■ In its judgment, the trial court responded to Bridgecrest's request, as per Rule 73.01(a)(3), for specific findings regarding Mr. Lippman's first amended petition for a permanent injunction. The trial court found that Bridgecrest had acted properly and within its lawful authority in exercising its right of first refusal to purchase the Klass unit. On the issue of whether Bridgecrest qualified as "housing for older persons" under the Fair Housing Act, 42 U.S.C. Section 3607(b)(2). these additional findings by the trial court are pertinent to the issues before us:

   (a) that Bridgecrest qualified as "housing for older persons" as defined by 42 U.S.C. Section 3607(b)(2);

   (b) that over 80 % of the occupied units of Bridgecrest were occupied by at least one person who was 55 years of age or older and that Bridgecrest had established this fact by providing a reliable survey and affidavit;

   (c) that Bridgecrest published and adhered to policies and procedures that demonstrated an intent to be housing for older persons; and

   (d) that Bridgecrest acted properly in exercising its right of first refusal to purchase the Klass unit.

To qualify as housing for older persons under the Fair Housing Act, three requirements must be met: (1) at least 80 % of the occupied units are occupied by at least one person who is 55 years of age or older; (2) the housing facility publishes and adheres to policies and procedures that demonstrate the intent to provide housing for persons aged 55 or older; and (3) the housing facility complies with HUD rules and regulations for verification of occupancy. 42 U.S.C. Section 3607(b)(2)(C)(i)–(iii).

We find the second requirement of published policies and procedures dispositive

of the issues in this case. We choose not to decide whether Bridgecrest met the occupancy and age verification requirements.

The trial court erred when it found that Bridgecrest published and adhered to policies and procedures that demonstrated an intent to be housing for older persons. "To demonstrate this intent, the Association's rules and regulations must explicitly restrict residence to persons fifty-five years or older." *Massaro v. Mainlands Section 1 & 2 Civic Ass'n*, 3 F.3d 1472, 1478 (11th Cir.1993) *cert. denied*, 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994); *Simovits v. Chanticleer Condominium Ass'n*, 933 F.Supp. 1394, 1401 (N.D.Ill. 1996). Before the 1995 amendments to the Fair Housing Act, H.U.D. provided a list of six nonexclusive factors for determining whether a facility has sufficient policies and procedures under the statute. These nonexclusive factors were:

(1) the housing facility's written rules and regulations;

(2) the manner in which the housing is described to prospective residents;

(3) the nature of advertising;

(4) age verification procedures;

(5) lease provisions; and

(6) actual practices of the management in enforcing the relevant rules and regulations. 24 C.F.R. Section 100.316(b)(1)–(6) (1995).

Although Section 100.316 was eliminated on April 25, 1996, the *Simovits* court concluded that that section's provisions remained intact. Without deciding whether the six factors are still applicable, this court finds them useful in an analysis of Bridgecrest's intent to serve as housing for older persons.

*The housing facility's written rules and regulations.* By Bridgecrest's own admission, at the time of the alleged discrimination, there was no age restriction in Bridgecrest's amended declaration. The age

restriction contained in the 1969 and 1986 condominium declaration and by-laws was deleted in the 1991 amendment and not reinstated in the 1992 amendment. The minutes of an owners' association meeting in June, 1996 noted that there was "discussion concerning age limit[s] for the purchase of condos in the past" and that "[t]his is now in the process of reversal to age 52, if an area is occupied by 80% Seniors." The minutes do not reflect any decision or vote to amend Bridgecrest's declaration and by-laws in accordance with legislative changes.

Bridgecrest's property manager testified that Bridgecrest reverted to its former policies as soon as the 1995 amendments to the Fair Housing Act lifted the "significant facilities and services requirement." The property manager also candidly admitted that no documents set out Bridgecrest's intent to return to an age restriction policy.[4] Bridgecrest argues that neither the legislative history nor the H.U.D. regulations for 42 U.S.C. Section 3607(b)(2)(C) require that the age restriction be included in the condominium declaration. In Bridgecrest's case, the evidence is undisputed that neither the governing documents nor any written rules and regulations explicitly set out the age restrictions. The above noted reference in the association's June, 1996 minutes to "some discussion" concerning age limits "which is now in the process of reversal," even if generously construed to infer an intent to comply with the law, fails to comply with the requirement of 42 U.S.C. Section 3607(b)(2)(C) that the housing facility publish and adhere to policies and procedures that demonstrate an intent to be housing for older persons.

*The manner which the housing is described to prospective residents.* Bridgecrest's property manager testified that the age restriction was made known informally

---

**4.** The property manager did testify the by-laws were being amended in June, 1997 to specifically refer to the age restriction.

to potential buyers through the association board and residents.

*The nature of advertising.* Bridgecrest testified that it did not engage in any advertising. However, the April, 1997 published multilistings, submitted at trial, for nine new Bridgecrest units planned for construction, did not include any indication that Bridgecrest intended to restrict residency to older persons.

*Age verification procedures.* At trial, Bridgecrest's president testified that he surveyed residents by phone or in person for the purpose of recording their ages. The survey was conducted on April 25, 1997 after the alleged discrimination and after Mr. Lippman filed this litigation. As noted above, we do not decide whether the survey complied with the age verification requirements of 42 U.S.C. Section 3607(b)(2)(C)(iii)(I).

*Lease provisions.* The instant case involves a sale agreement, not a lease provision.

*Actual practices of the managment in enforcing the relevant rules and regulations.* Bridgecrest's property manager testified that it was the association board's desire to enforce an age restriction, and the president and a member of the Bridgecrest board testified that residents wished to enforce an age restriction.

If we weigh these six nonexclusive factors, it appears that although Bridgecrest informally wished to abide by an age restriction, the board failed to formalize this intention in their declaration and by-laws or any published policies and procedures. The intention, without published policies and procedures, is insufficient to satisfy the second prong required to qualify Bridgecrest as housing for older persons under the Fair Housing Act. 42 U.S.C. Section 3607(b)(2)(C)(i)–(iii).

Because Bridgecrest fails to qualify as housing for older persons under 42 U.S.C. Section 3607(b), it is not exempt from 42 U.S.C. Section 3604(a) which prohibits discrimination, based on familial status, in the sale or rental of housing. If Bridgecrest used its right of first refusal solely to discriminate based on familial status, the trial court erred in finding that Bridgecrest properly exercised its right of first refusal to purchase the Klass unit. At trial, two Bridgecrest board members testified that the sole reason for exercising the right of first refusal was to stop Mr. Lippman from leasing the unit to someone who did not meet Bridgecrest's age restriction. Because Bridgecrest does not qualify for an older persons' housing exemption under the Fair Housing Act, Bridgecrest's exercise of its right of first refusal was improper.

In *Phillips v. Hunter Trails Community Association,* 685 F.2d 184 (7th Cir. 1982), a subdivision association attempted to exercise a right of first refusal to prevent an African American car-wash operator from purchasing a home in the subdivision. On appeal from judgment for the buyer, the court rejected the association's argument that its attempted sale of the right of first refusal to another buyer was an honest effort to protect property values in the subdivision rather than an intent to discriminate on the basis of race. *Id.* at 186. The court concluded that because the terms of the association's arrangement with the new buyer were essentially those agreed to by the plaintiff, except for the $10,000 cost of purchasing the option itself, there was a "powerful inference that price was not the Board's primary concern." *Id.* The court concluded that an incriminating statement made by the association's attorney to a business acquaintance, that the subdivision was an exclusive community that did not include "niggers" and "car wash operators," supported the trial court's finding of intentional racial discrimination. *Id.* at 188–89. The court affirmed the trial court's finding that the association's exercise of its right of first refusal violated the Fair Housing Act, 42 U.S.C.A. Sections 3601 – 3631.

In *Wolinsky v. Kadison,* 114 Ill.App.3d 527, 70 Ill.Dec. 277, 449 N.E.2d 151 (1983),

the plaintiff-owner appealed a judgment for a defendant condominium association that exercised its right of first refusal to prevent her from purchasing another unit in the same condominium. Among other issues, the plaintiff argued that the association exercised the option in violation of a Chicago condominium ordinance that prohibited discrimination in the purchase or lease of a unit because of "race, religion, sex, sexual preference, marital status or national origin." Muncipal Code of Chicago 1978, ch. 100.2, par. 100.2–4. Plaintiff based her complaint on her status as an unmarried mother. *Id.* 449 N.E.2d at 154. The court stated that a right of first refusal must be exercised reasonably. *Id.* at 155. "The criteria for testing the reasonableness of an exercise of this power by a condominium association are: (1) whether the reason for exercising the right of first refusal is rationally related to the protection, preservation or proper operation of the property and the purposes of the association as set forth in its governing instruments and (2) whether the power was exercised in a fair and nondiscriminatory manner." *Id.* The condominium association argued that the plaintiff did not have standing to claim a violation of the city ordinance because the association exercised its right of first refusal to prevent the unit's seller from conveying it to the plaintiff and did not refuse plaintiff the right to purchase. The trial court found no merit in this contention. *Id.* at 158. "We ...believe that if a right of first refusal is exercised so that a prospective purchaser is unable to purchase a unit because of his or her race, religion, sex, sexual preference, marital status or national origin, the ordinance has been violated." *Id.* The court reversed and remanded plaintiff's count for a determination of whether the condominium association had unreasonably exercised its right of first refusal in violation of the city's condominium anti-discrimination ordinance. *Id.* at 159.

Applying the findings in *Phillips* and *Wolinsky* to the case before us, Bridgecrest stated at trial that its sole intention in exercising its right of first refusal was to prevent Mr. Lippman from purchasing the unit and renting it to persons who did not meet Bridgecrest's age restriction. Unlike the subdivision association in *Phillips*, Bridgecrest did not offer a nondiscriminatory motive for exercising the right of first refusal. Applying Wolinsky's criteria for determining the reasonable exercise of a right of first refusal to the instant case, it is clear that Bridgecrest's conduct was not reasonable. Although Bridgecrest may have intended to serve as housing for older persons, (1) its governing instrument did not contain an age restriction nor were there any other published rules and regulations to reflect their intention to serve as housing for older persons; and (2) the right of first refusal was exercised, by Bridgecrest's own admission, to discriminate based on age.

We conclude that exercise of a right of first refusal to discriminate on the basis of familial status, absent an exemption under the Fair Housing Act, is, as a matter of law, improper. The trial court erred in finding that Bridgecrest properly exercised its right of first refusal.

## II. Lis Pendens

Absolute privilege attaches to the filing of a lis pendens when such notice has a reasonable relation to the action filed. *Sharpton v. Lofton,* 721 S.W.2d 770 (Mo. App.1986); *Houska v. Frederick,* 447 S.W.2d 514, 519 (Mo.1969); *Birdsong v. Bydalek,* 953 S.W.2d 103, 114 (Mo.App. 1997); Section 527.260 RSMo 1994. "Consequently, neither Plaintiffs' motive nor evidence tending to show motive is relevant. The only relevant inquiry is whether the lis pendens notice bore a reasonable relation to the action filed." *Birdsong,* 953 S.W.2d at 114. On February 6, 1997, Mr. Lippman informed Bridgecrest of his contract to purchase the Klass unit. When notified by Bridgecrest that it would exercise its right of first refusal solely because Mr. Lippman refused to abide by the age

restriction, an age restriction he believed to be invalid under the Fair Housing Act, Mr. Lippman filed a petition for a temporary restraining order, preliminary injunction, and permanent injunction to enjoin Bridgecrest from purchasing the Klass unit. As of March 25, 1997, the date Mr. Lippman filed the notice of lis pendens, Mr. Lippman's petition for the permanent injunction was still pending. Mr. Lippman's filing of the notice of lis pendens had a reasonable relation to his petition for a permanent injunction. We reverse the court's order awarding damages of $2,095.35 to Bridgecrest against Mr. Lippman for clouding title to the Klass unit.

### III. Damages against the TRO Bond

On appeal, Mr. Lippman argues that the trial court erred when it awarded, in its May 19 judgment, $2,756.25 in additional attorney's fees incurred between March 10, 1997 and March 18, 1997 to remove the TRO because the TRO bond had expired on March 10. Mr. Lippman also argues that the trial court erred when it awarded Bridgecrest $3,791.25 against the TRO bond in its March 18 order because the TRO was properly granted. We agree.

The trial court's February 28 order states that the TRO "shall remain in full force and effect" until March 10, 1997 unless sooner dissolved by order of the court. Rule 92.02(b)[5] established that a TRO "shall expire by its terms within such time after entry, not to exceed ten days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record." The trial court fixed the expiration of the TRO as March 10. The order was not extended. Although the trial court purportedly dissolved the TRO on March 18, 1997, the TRO had already dissolved by its terms on March 10. "If ten days elapses without a

valid extension, the temporary restraining order expires by its own terms." *Grist v. Grist*, 946 S.W.2d 780, 781 (Mo.App.1997). "If a temporary restraining order expires by its own terms, the trial court, while losing jurisdiction to enter an order dissolving that restraining order, nevertheless retains jurisdiction to hear the action on the merits." Id. at 782. *See also Furniture Manufacturing Corp. v. Joseph*, 900 S.W.2d 642, 646 (Mo.App.1995). The trial court erred in its award of damages against the TRO bond for attorney's fees incurred between March 10 and March 18 to remove the TRO bond because the TRO bond had expired on March 10.

In its March 18 order denying Mr. Lippman's petition for a preliminary injunction and purportedly dissolving the TRO, the trial court assessed $3,791.25 in attorneys fees and damages against the TRO bond posted by Mr. Lippman. Although the trial court lacked jurisdiction to enter the order dissolving the TRO on March 18, the court's award of attorneys fees against the bond reflects its determination that the TRO was wrongfully obtained. Sections 526.070 and 526.200 RSMo 1994. "Once a bond is posted and a temporary injunction granted, the plaintiff's liability on the bond accrues and the defendant's cause of action comes into existence at the time the trial court determines that the temporary injunction was wrongfully issued." William G. Reeves, *Damages Recoverable on Injunction Bonds in Missouri*, 44 Mo. L. Rev. 269, 271 (1979). The justification for allowing attorneys fees upon the dissolution of an injunction is that the defendant has been compelled to incur expenses in ridding himself of an unjust restriction placed upon him by the action of the plaintiff. *Collins & Hermann, Inc.–Welsbach & Assocs. v. St. Louis County*, 684 S.W.2d 324, 326 (Mo. banc 1985). Because, as we have established, the TRO was not wrongfully obtained or an unjust restriction, the trial

5. Mo R. Civ. P. 92.02(b) (1997)

court erred when it assessed $3,791.25 for attorneys fees to Bridgecrest against the TRO bond in its March 18 order.

The judgment of the trial court is reversed.

CRANDALL and KAROHL, JJ., concur.