Freddie DOUGLAS, et al.,
Plaintiffs-Appellees,

v.

METRO RENTAL SERVICES, INC.,
Defendant-Appellant.

No. 86–2615.

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1987.
Decided Aug. 26, 1987.

Thomas M. Cannon, Reick & Crotty, P.C., Chicago, Ill., for defendant-appellant.

F. Willis Caruso, Leadership Council, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS, HARLINGTON WOOD, Jr., and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiffs sought declaratory and injunctive relief and monetary damages for an alleged violation of their rights under the Fair Housing Act, 42 U.S.C. § 3601 [1] *et seq.*, and under the Civil Rights Act of 1866, 42 U.S.C. § 1982.[2]   The plaintiffs

---

**1.** The Fair Housing Act, 42 U.S.C. § 3604, provides as follows concerning discrimination in the sale or rental of housing:

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin.

**2.** The Civil Rights Act of 1866, 42 U.S.C. § 1982 provides as follows:

All citizens of the United States shall have the same right, in every State and Territory,

claimed that the defendants refused to rent an apartment to them on account of their race.

There are two issues. The first is the claimed inconsistency arising out of a jury verdict in favor of defendant Stephen Wolf, and a default judgment against defendant Metro Rental Services, Inc., of which Wolf was president. After default was entered against Metro, the magistrate[3] entered a judgment against Metro in the amount of $40,000 compensatory damages and $75,000 punitive damages, a total of $115,000. The second issue is that in the event the default judgment stands as not inconsistent, Metro claims the damages are grossly excessive.

## I. FACTUAL BACKGROUND

In July of 1984, plaintiffs Freddie Douglas, an employee of a public relations firm, and her sister, Barbara Brewer, a tax accountant at Montgomery Ward, applied at the office of defendant Metro, a rental agency, seeking to rent an apartment in Chicago for themselves and Brewer's daughter, Keven Douglas, and her son, Dan Douglas. They filled out an application and looked at an apartment, but soon thereafter the application was rejected, it was claimed, because it included the children. The employee of Metro showing the apartment, a man who identified himself as Lester, expressed the opinion, however, that the application was rejected because the applicants were black. About a week later, Douglas filled out a second application for herself only and did not include the children. Douglas and Brewer returned to Metro's office to inquire about the renewed application. This time they met with defendant Stephen Wolf, president of Metro, who informed them that Lester was no longer employed with Metro, but that Wolf would review their application file and contact them. Subsequently, after hearing nothing from Wolf, Douglas and Brewer

returned to Metro's office to make another inquiry. This time Wolf explained that the second application had been rejected because the first application had included children. Wolf added that in his opinion, however, it was because the applicants were black. In response plaintiffs asked that their security deposit of $515,[4] which they had paid after looking at the apartment, be returned. Wolf agreed to return their deposit by check but not without a self-serving restrictive endorsement. Plaintiffs refused. Later plaintiffs again went to seek the return of their security deposit. Wolf said the return could be made only if the plaintiffs accepted the restrictive endorsement, which plaintiffs again refused to do. Wolf expressed the view that he knew what they were up against, being black, and added that if they decided to go to court he would assist them.

The only defendant in this appeal is Metro. In a separate settlement with the owner of the apartment building for which their application had been rejected, the plaintiffs were permitted to move into the apartment, and in addition they received approximately $13,000 damages. That amount is in addition to the $115,000 (plus the $515 security deposit) awarded by the magistrate against Metro in this case.

## II. ISSUES

*Inconsistency of the Two Judgments*

■ Metro claims that the judgment against it should be vacated because its president, defendant Wolf, who actually dealt with the plaintiffs, prevailed with the jury. Therefore, Metro argues, the judgment of liability against Metro is inconsistent with Wolf's favorable jury verdict and must be vacated. The magistrate concluded that the two results were not inconsistent, relying on *In re Uranium Antitrust Litigation*, 617 F.2d 1248 (7th Cir.1980). In that case this court considered the ven-

---

as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

3. The parties consented to trial before the magistrate under 28 U.S.C. § 636(c).

4. There was some dispute as to the exact amount of this deposit, but the parties stipulated to $515.

erable rule announced in *Frow v. De La Vega*, 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872), that if a suit should be decided against the plaintiff on the merits, then the complaint would be dismissed as to all defendants, including any defendant who had defaulted. In *Uranium Antitrust* we limited the *Frow* rule, however, to cases where all the defendants were claimed to be jointly, not severally, liable. The defendants here were not alleged to be jointly liable, but instead were sued individually.

Metro has cited two cases which, it argues, support Metro's position that a plaintiff should be collaterally estopped from obtaining a default judgment against one defendant which is logically inconsistent with a prior judgment in favor of another defendant.

In a Third Circuit case, *Farzetta v. Turner & Newall, Ltd.*, 797 F.2d 151 (3d Cir.1986), the court interpreted *Frow* to hold that

> if at trial facts are proved that exonerate certain defendants and that as a matter of logic preclude the liability of another defendant, the plaintiff should be collaterally estopped from obtaining a judgment against the latter defendant, even though it failed to participate in the proceeding in which the exculpatory facts were proved.

*Farzetta*, 797 F.2d at 154. As the court noted, that interpretation in the circumstances of that case is consistent with our holding in *Uranium Antitrust*. The court further explained that the plaintiff, who had assumed the risk of exposure to asbestos supplied by one defendant, had not necessarily assumed the risk of exposure to asbestos supplied by two other, defaulting, defendants.

The Eleventh Circuit in *Gulf Coast Fans, Inc. v. Midwest Electronics Importers, Inc.*, 740 F.2d 1499 (11th Cir.1984), found it to be sound policy that "when defendants are similarly situated, but not jointly liable, judgment should not be entered against a defaulting defendant if the other defendant prevails on the merits." *Id.* at 1512. Therefore, the court reasoned, it would be inconsistent for the plaintiff to collect a judgment against the defaulting defendant on a contract when a jury, in a suit against another defendant under the same contract, had found that the plaintiff itself had breached that contract.

The present defendants were not alleged to be jointly liable and they were not similarly situated as the defendants in *Gulf Coast*, who were all parties to the same contract. There is no common contract in the present case as in *Gulf Coast*. The Third Circuit found in *Farzetta* that assuming the risk of harm from one source did not necessarily compel a finding of assumed risk of harm from another, perhaps comparable, source. Likewise, we find that the exoneration of one defendant of charges of discrimination does not compel the finding that no corporate discrimination occurred.

Metro argues that as a corporation it could act only through its agents, and no agent was found responsible for the discrimination. How could it, Metro asks, be found responsible for the discrimination if its president, Wolf, who dealt with the plaintiffs, was not personally guilty of discrimination? In spite of there being some logic to that argument, it remains that there was no claim of joint liability, each defendant having been sued individually and separately. Moreover, we agree with the magistrate that the two judgments are not necessarily inconsistent. By its default Metro admitted liability. The default is not explained, but perhaps it was oversight or a misguided tactical decision. One can speculate as to how the supposed inconsistency between the two judgments might be explained. It may be that Lester, the first Metro employee to meet plaintiffs, was the one who instigated the discrimination, or that Metro had a policy of racial discrimination set by its board of directors, or that other employees were involved. We cannot be sure, but Metro caused these problems by defaulting, and cannot now take advantage of the judgment in favor of its president. For whatever reason Metro, by defaulting, admitted its guilt in that it "refused to rent, refused to negotiate for the rental of, and otherwise made unavailable

and denied to Plaintiffs a unit in said apartment building because Plaintiffs are black," and further admitted that in doing so "Defendants acted intentionally and maliciously...." The magistrate assessed heavy damages. We conclude that the default judgment against Metro is entitled to stand.

*Damages*

■ "[W]hen a judge functions as the trier of fact, ... his estimate of damages for intangible injuries is subject to the 'clearly erroneous' rule." *Phillips v. Hunter Trails Community Association*, 685 F.2d 184, 190 (7th Cir.1982). In this case, as in *Phillips*, however, "we have the 'definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

■ Similar to *Phillips*, the magistrate determined her award of compensatory damages after consideration of the adult plaintiffs' demeanor and their testimony as to their mental and emotional distress. The incident was most unfortunate and understandably disagreeable to all plaintiffs, but the damages can be no more than what is within reason under the particular circumstances. It must be remembered that the plaintiffs later moved into the apartment that was at issue here, and received approximately $13,000 from the apartment owner.

The magistrate awarded each plaintiff, including the two children, $10,000 each in compensatory damages, and in addition punitive damages in the amount of $75,000, a total of $115,000, which added to the amount received from the owner is a total of $128,000. In these matters the trial judge (or magistrate) has considerable discretion. The amount of damages will not be disturbed on appeal unless the award is clearly excessive. *See Busche v. Burkee*, 649 F.2d 509, 518 (7th Cir.) (42 U.S.C. § 1983 suit), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). We have reviewed this record and find that the damage award is grossly excessive, even accepting the plaintiffs' testimony as completely true. Before we examine that testimony, however, we briefly discuss the *Phillips* case.

In *Phillips*, a housing discrimination case, this court found an award of $25,000 for each plaintiff to be excessive and reduced it to $10,000. A black family had offered more than $600,000 for a house in an exclusive subdivision in Oak Brook, Illinois, and the owner accepted the offer. When the subdivision association heard about the anticipated sale, it tried to arrange to sell the same property to another party under a restrictive covenant that provided the association with a thirty-day right of first refusal of any proposed sale. A substitute sale was arranged, but the seller refused to close because the buyer would not indemnify the seller against possible liability to the plaintiffs. In the meantime the plaintiffs, relying on the acceptance, had sold their former house, so in addition to being disappointed, humiliated, and angry, the plaintiffs were forced to live in hotels, or with relatives, while looking for a temporary rental apartment. They had to store their furniture and live out of suitcases. During this time of nomadic abode two of their cars were stolen, and other property was lost. This court sustained the $100,-000 punitive damages award against a wealthy association which had clearly and actively conspired to keep plaintiffs out of the subdivision, an action which differs considerably from whatever role Metro had in the present case. Although the plaintiffs experienced the anger, humiliation, and disappointment that the Phillipses suffered, they did not suffer in addition the more tangible and measurable injuries as did the Phillips family.

Douglas testified that since the incident she had "looked differently" at her coworkers and the general public and had become self-conscious. She also said that the incident had affected her and her work, although she did receive a promotion and pay raise during the period. Her children had experienced discrimination previously, Brewer testified, but this rejection caused changes in their attitudes and aspirations because of their increased self-conscious-

ness about their racial status. It caused her daughter, she testified, to express the wish that she were white. Her son believed, Brewer also said, that he had to choose some sport other than the one he preferred because of his color.

These and similar aspects of intangible injury, in these circumstances, as serious as they are, cannot justify total compensatory damages to plaintiffs of $40,000. There were no tangible injuries comparable to those suffered by the plaintiffs in *Phillips*. On balance, a judgment of only $2,500 can be reasonably justified for each plaintiff, the total amount of compensatory damages, therefore, being $10,000.

■ Some, but not all, of the punitive damages award is likewise justified. "Punitive damages are awards in the jury's discretion to punish (the defendant) for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Smith v. Wade*, 461 U.S. 30, 54, 103 S.Ct. 1625, 1639, 75 L.Ed.2d 632 (1983) (quoting Restatement (Second) of Torts § 908(1) (1979)). Wolf and Lester both candidly suggested to plaintiffs that the real reason the plaintiffs were denied the apartment was their color, Wolf even offering to help the plaintiffs in court if they decided to sue. It is clear, therefore, that there was no organized conspiracy by Metro and its employees to harm plaintiffs. The blame seems more likely to fall on the apartment owner. That Metro would have sustained any liability, punitive or otherwise, had it not deliberately defaulted, is questionable. In any event, an award of an additional $75,000 in punitive damages to plaintiffs in these circumstances is also unreasonable. The punitive damages award is therefore reduced to $20,000. That amount should be reasonably sufficient to warn others similarly situated and with similar discriminatory ideas that discrimination is too expensive to risk. Money damages, whatever the amount, however, are no substitute for fair and decent relationships between all citizens.

The plaintiffs finally gained the apartment, and in addition, with the settlement and the damages awarded under this revi-

sion, will have received a total of about $43,000 in damages plus the return of the security deposit. We consider that total amount to be fair, reasonable, and fully adequate under the particular circumstances in this case. The parties shall bear their own costs.

AFFIRMED AS MODIFIED BY THIS OPINION.