CITY OF CHICAGO, a municipal corporation, Leadership Council for Metropolitan Open Communities, a not-for-profit Illinois corporation, Glenn Brewer, Karen Haskins–Brewer, Victor Crown, Melvin Dillard, Queen Frazier, Sandi Gaffen, William McCarthy, and Sharon Swan, Plaintiffs–Appellees,

v.

MATCHMAKER REAL ESTATE SALES CENTER, INCORPORATED, an Illinois corporation, Daniel King, Sara Munoz, Carol Scarpiniti, Alan M. Walker, and Erwin Ernst, Defendants–Appellants.

Nos. 91–2491, 91–3861.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1992.

Decided Dec. 10, 1992.

Rehearing Denied Jan. 11, 1993.

Rehearing and Rehearing En Banc Denied Jan. 25, 1993.

1088

Joel D. Stein, Corp. Counsel, Elizabeth Sklarsky, Chicago, IL, for City of Chicago in No. 91–3861.

James R. Beyer, Jeffrey K. Ross (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for plaintiffs-appellees in No. 91–3861.

John L. Gubbins (argued), Monfort, WI, for defendants-appellants.

John P. Relman, Paul M. Smith, Joel I. Klein, Klein, Farr, Smith & Taranto, DC, for National Fair Housing Alliance, amicus curiae.

Lawrence Rosenthal, Deputy Corp. Counsel, Benna R. Solomon, Mardell Nereim (argued), Kelly R. Welsh, Asst. Corp. Counsel, Appeals Div., for City of Chicago, in No. 91–2491.

James R. Beyer, Jeffrey K. Ross (argued), Brenda A. Russell, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL for plaintiffs-appellees in No. 91–2491.

Laurene K. Janik (argued), Joshua J. Nathan, National Ass'n of Realtors, Chicago, IL, Robert D. Butters, Cichocki & Armstrong, Oak Park, IL, for Illinois Ass'n of Realtors, National Ass'n of Realtors and Chicago Bd. of Realtors, amicus curiae.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

BAUER, Chief Judge.

Plaintiffs, consisting of the City of Chicago (the "City"), the Leadership Council for Metropolitan Open Communities (the "Leadership Council"), and individual "test-

ers," sued Matchmaker Real Estate Sales Center, Inc. ("Matchmaker"), its sole shareholder Erwin Ernst, and its sales agents, Daniel King, Sara Munoz, Carol Scarpiniti, and Alan Walker. Plaintiffs sought recovery for violations of the Civil Rights Act of 1866, 42 U.S.C. § 1982 ("Section 1982"),[1] and the 1968 Fair Housing Act, 42 U.S.C. §§ 3604(a), (b), and (d) ("Section 3604").[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to trial before a magistrate judge. After a bench trial, the magistrate judge found the defendants liable. She awarded the plaintiffs compensatory damages, punitive damages, and attorneys' fees. For the reasons set forth below, we affirm in part and reverse in part.

## I. FACTS

In 1987, the Leadership Council suspected that the defendants were engaging in the illegal practice of racial steering.[3] The Leadership Council therefore conducted a series of tests of defendants' activities. Pairs of black and white "testers"—individuals who posed as homeseekers—went to Matchmaker and inquired about buying homes on the southwest side of Chicago or nearby suburbs.[4] The Leadership Council closely matched the black and white teams for financial qualifications (including income and possible down payments) and housing needs (such as family size and preferences). Beginning in July of 1987, the Leadership Council, through its testers, began the first of five tests.

### A. Test One

In July of 1987, Rosalinda Castillo, a white tester, called Matchmaker and spoke to defendant Daniel King. She requested information about houses for sale priced in the $70,000 range. King ascertained Castillo's family size and available downpayment ($10,000). Tr. at 245–46. On July 25, 1987, Castillo met King at the Matchmaker office. They discussed financing and possible mortgage lenders. Castillo and her white co-tester, Kenneth Govas, told King their combined income was $39,000. King suggested that they look in the West Lawn and Garfield Ridge areas. Tr. at 247. Both are white neighborhoods. King had a Multiple Listing Service ("MLS") list of many homes with prices up to $75,000 which provided addresses, neighborhoods, and other general information.

King crossed out two houses on the list. Both houses were in areas that had virtually a 100% black population. King advised the testers that if they saw a house in West Lawn, West Elsdon, or Garfield Ridge (all white areas), they should move quickly because those houses generally sell fast, unlike the homes in the Gage Park

---

1. Section 1982 states: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

2. Section 3604 states, in pertinent part:
 [I]t shall be unlawful—
 (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
 (b) To discriminate against any person in terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status or national origin.
 * * * * * *
 (d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

3. Racial steering is
 a 'practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups.' *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 366 n. 1, 102 S.Ct. 1114, 1118 n. 1, 71 L.Ed.2d 214 (1982) (quoting plaintiffs' complaint).

4. Certain areas of southwest Chicago had a black population of less than ten percent. Other areas, which we categorize as racially mixed, had a black population between 10 and 50 percent. Finally, other areas had black populations in excess of 50 percent. We will identify these areas as necessary throughout our discussion of the facts.

and Chicago Lawn areas along Western Avenue (which were either racially mixed or black areas). King also gave the white testers a detailed computer printout list of six houses in the West Lawn and West Elsdon areas.

Also in July of 1987, Deborah Bennett, a black tester, called Matchmaker's office and spoke with King. Tr. at 343. Bennett requested information about houses for sale in the $70,000 price range. Bennett informed King that her family income was $51,000 and that their available down payment was $12,000. Tr. at 344. On July 25, 1987, Bennett and her black co-tester, Maurice Bennett, met with King. King told them they should have no problem obtaining financing, but he made no specific suggestions about obtaining financing as he did with the white testers. King showed the black testers a picture of a house available for $39,900 in a racially mixed area. Tr. at 346. King did this despite the black testers' specific request for houses in the $70,000 price range. King also gave the black testers a listing of about 40 houses in Gage Park and Chicago Lawn (both racially mixed or black areas). The houses on the list ranged in price from $45,900 to $52,000, well below the requested $70,000 price range. Tr. at 571.

### B. *Test Two*

In August of 1987, Rita Ernst, a white tester, called Matchmaker and spoke to Alan Walker. She requested information about houses for sale priced in the $65,000 to $70,000 range, with easy access to and from Peoria. Ms. Ernst informed Walker that she and her family had moved from Georgia and had rented a house in Hazelcrest, a Chicago suburb. Tr. at 225. Ernst stated that her family's income was $42,000 and that their available down payment was $9,000. Tr. at 224. On August 13, 1987, Walker called Rita Ernst and told her about five houses he had selected. All of the houses were located in white areas west of Kedzie Avenue.[5] On August 15, 1987, Walker met Rita Ernst and her white

co-tester, Joseph Ernst, to inspect the houses he had selected. After Rita Ernst asked Walker about the absence of "For Sale" signs in front of the houses, he responded that "these were nice neighborhoods and that they want to keep the neighborhoods nice." Tr. at 229. He also said that the signs were missing in order to discourage "certain parties [who] want to come in." Tr. at 1009.

In March of 1988, the Ernsts met Walker again and viewed two additional homes he had selected. Tr. at 371–72. Both houses were in their price range and located in white areas west of Kedzie. Also, Walker told the white testers that he had a third house in Gage Park that was "nice" but that he would not show it to them because it was "east of Kedzie" (in a black area) and they "wouldn't want to live there." Tr. at 376–78.

Also in August of 1987, Lynda Hale, a black tester, called Matchmaker and spoke to King. Hale requested information about homes in the $70,000 to $75,000 range in southern Gage Park and Chicago Lawn between 55th and 71st Streets west of Western Avenue. She also told King that she preferred a home near Midway Airport because her husband travelled from there often. Tr. at 387–88. When Ms. Hale and her black co-tester, James Hill, arrived for their appointment on August 16, 1987, King had already selected four homes south of 71st Street, three of which were east of Western Avenue. All of the homes were in racially mixed areas and priced well below the black testers' requested price ranges. When the black testers renewed their request to see homes which were located north of 71st Street and west of Western, King did not shift his focus to the west. Instead, he selected two homes located near Western Avenue, priced between $57,000 and $57,999, more than $12,000 below the low end of the testers' price range and located in racially mixed areas. Tr. at 391. At the time the black testers visited Matchmaker, homes were available in the requested $70,000 to $75,000 price

---

5. All parties apparently treated Kedzie Avenue as a racial dividing line. West of Kedzie was

considered a white area, while east of Kedzie was considered a black area.

range, as the white testers in Test One had been given listings for West Lawn and West Elsdon (both white areas) in that price range less than two weeks earlier. Also, the West Lawn and West Elsdon areas are significantly closer to Midway Airport.

## C. Test Three

In late October of 1987, Elvia Fernandez, a white tester, telephoned Matchmaker's office and asked about a house located in West Lawn (a white area) that had been advertised for sale. She spoke to Alan Walker and told him she was married with one child and had a household income of $40,000. Tr. at 300–01. He provided her with information about the advertised house and also suggested that Fernandez drive by another house in the area that was not yet advertised. On October 31, 1987, Fernandez and her white co-tester, Manolo Castillo, met with Walker and told him that they wanted to inspect the unadvertised house. Walker asked the white testers about their preference in housing, their price range ($60,000 to $70,000), and down payment. Tr. at 301. Walker also set up an appointment for the white testers to inspect the house. He showed the white testers the house and advised them to call him as soon as they made a decision.

On the same day the white testers called, Theresa Prim, a black tester, telephoned Matchmaker and requested information about homes advertised in the same advertisement the white testers had called about. Prim spoke with Matchmaker agent Sara Munoz. Tr. at 990. The first house Prim asked about was in West Elsdon (a white area). The second house was in West Lawn (also a white area). Munoz told Prim that the price of the first home was $82,500, and the price of the second house was $75,000. Prim informed Munoz that her price range was $60,000, but also said she wanted to see both houses. Munoz told Prim that Prim should make an offer and see if the owners would negotiate. When Prim asked if Matchmaker had any other listings, Munoz suggested two homes priced at $51,000 and $59,900. The homes were located in Gage Park and Chicago Lawn (both black areas). Munoz never asked about Prim's income or possible down payment. Tr. at 991.

Later, Munoz called Prim and informed black tester Gregory Lawrence (Prim's husband) that she could not find anything else. Tr. at 476. Munoz made this statement the same day the white testers received a computer listing of 41 houses in response to their request to see houses in the same price range as the black testers. Tr. at 479–81. A few days later, Munoz told Prim that she had been unable to contact any of the owners of the four houses. Prim requested that Munoz arrange viewing appointments for the four houses during that week, preferably on Saturday, November 7. On Friday, November 6, Munoz made two appointments for the next day at the two homes in Gage Park and Chicago Lawn. Both were priced significantly lower than the homes Prim originally called about.

Munoz showed the black testers the two houses, but she made no effort to sell the houses and provided little information to the black testers. See Tr. at 479–81. Munoz did not request any information about their employment or financial situations, and did not offer any suggestions as to how they could obtain financing. After showing the two houses, Munoz offered to go back to her office to see if she had any more listings. The black testers declined to go because they felt that Munoz was not interested in dealing with them. Tr. at 481.

## D. Test Four

In early June of 1988, Sharon Swan, a white tester, called Matchmaker and spoke to King. She requested information about houses for sale priced in the $70,000 to $80,000 range. On June 4, 1988, Swan met with King at the Matchmaker office. King asked about the employment of Swan and her white co-tester Victor Crown. Although King did not ask the white testers about their income, he advised them that they would have no trouble obtaining a mortgage. Prior to their arrival, King scheduled two appointments for the white

testers to look at homes in the white areas of West Lawn and West Elsdon. The properties were priced at $86,900 and $84,900. King also provided Swan with a detailed computer listing of 19 houses ranging in price from $72,900 to $84,900 located in West Lawn, Scottsdale, and Mount Greenwood—all white areas that King described as "good neighborhoods" with houses that had "good resale value." Tr. at 200, 637–39. King made no such comments to any of the black testers with whom he dealt in Tests One and Two.

Also in early June of 1988, a day after the white testers called, Queen Frazier, a black tester, called Matchmaker's offices. The magistrate judge found that Frazier's accent, as heard at trial, as well as her name, probably identified her as a black person. Op. of Nov. 7, 1990 at 18. Frazier spoke to Munoz and requested information about houses in the $65,000 to $70,000 range. She later told Munoz that she needed to be near a bus line. Tr. at 270–71. Munoz gave Frazier a list of three houses located in Chicago Lawn, east of Kedzie, in a racially mixed area. The houses were priced at $49,000, $64,900, and $69,000. Tr. at 271–72. Munoz made an appointment for June 4, 1988 to see Frazier and her black co-tester, Melvin Dillard, at the Matchmaker office. This was the same day as the white testers' appointment.

At the June 4, 1988 meeting, Munoz provided the black testers with a computer printout of 141 houses, all in Chicago Lawn. There were no houses above the black testers' price range on the printout. Sixteen of the houses listed were in the black testers' price range of $65,000 to $70,000, while 125 homes were priced below $65,000. See Tr. at 293–94, 739–40. White tester Swan, who was in the Matchmaker offices at the same time, received a completely different listing of houses available—all of which were in white areas.

From the original list of three houses Munoz had provided over the telephone, Frazier told Munoz that she wanted to inspect the $69,000 house. Munoz informed the black testers that the house had no garage, although they had not requested a

house with a garage. Tr. at 272–73. The black testers then asked to see the $64,900 house, which was also located in Chicago Lawn, east of Kedzie. Munoz told the black testers that she had been unable to contact the homeowners. Munoz then requested the black testers' work telephone number, in case more listings became available. Tr. at 275.

### E. *Test Five*

Shortly after Test 4, but still during June of 1988, William McCarthy, a white tester, called Matchmaker's office. McCarthy spoke to King about houses for sale in the $80,000 to $90,000 price range. McCarthy told King that he and his wife were from the north side of Chicago and knew nothing about the southwest side. Tr. at 159. King asked about McCarthy's finances and employment and scheduled an appointment for June 13, 1988. At the meeting, Sara Munoz initially met with the testers and produced a general computer list of approximately 200 houses in white suburban areas for McCarthy and his white cotester, Sandi Gaffen. When it appeared that King would not keep the appointment with the white testers, Carol Scarpiniti agreed to meet with them.

Scarpiniti asked the white testers to close the door and, after they had done this, told them that she could help them in ways that sales manager Robert Ernst could not. Scarpiniti said she knew she was "not supposed to steer," but because the white testers were from the north side, she would give them "boundaries" to tell them "where not to live." Pl.'s Ex. 17. She then told the white testers to "[m]ove as far west of Kedzie as you possibly can." Tr. at 162.

Unlike the black testers of Tests Two and Four, the white testers were not given any listings of houses in Chicago Lawn and Gage Park (both black areas). Scarpiniti claimed that she did not give any Chicago Lawn listings to the white testers because they had a much higher income ($51,000) than the vast majority of Matchmaker's customers. The white testers' income in Test Five, however, was the same as the

black testers' income in Test One, yet the black testers were encouraged to see houses in Chicago Lawn and Gage Park that were $20,000 to $30,000 below their price range.

Scarpiniti also admitted that the white testers had expressed an interest in seeing bungalows and that "[t]he general population for the bungalows is in Chicago Lawn and Gage Park." Tr. at 800. Both are racially mixed or black areas. Matchmaker had numerous listings for bungalows in Gage Park and Chicago Lawn, but Scarpiniti did not show the white testers any bungalows in either area. By comparison, an agent of Matchmaker offered bungalows in Chicago Lawn and Gage Park to black tester Bennett in Test One even though these bungalows were far below her price range.[6] Scarpiniti took McCarthy's telephone number and encouraged the white testers to keep in touch.

On the same day that McCarthy called Matchmaker, Glenn Brewer, a black tester, called the Matchmaker office and spoke to Sara Munoz. Brewer told Munoz that he was married, had one child, and had a household income of $60,000. He asked about houses priced in the $75,500 to $90,000 range for sale north of 95th Street and informed her that he could make a down payment of up to $15,000. Tr. at 319–20. Munoz mailed Brewer a general listing of 26 houses in the white suburbs of Evergreen Park and Oak Lawn. About a week later, Brewer called Munoz with the addresses of four houses which he and his black co-tester, Karen Haskins–Brewer, had selected from the listings and wanted to inspect. Tr. at 322. Munoz then asked about Brewer's finances, income, and possible down payment. Munoz calculated how expensive a house Brewer could afford and offered to show him a breakdown of monthly payments. Five days later, Munoz called Brewer to inform him that she had

secured an appointment for only one of the four houses that Brewer had suggested. That house borders on the racially mixed Wrightwood section of Ashburn. The Brewers arrived so late for their appointment that Munoz canceled and left. Munoz subsequently reported that two of the four homes the Brewers had selected were sold. She could not get an appointment for one of the houses, but she had selected another home for them to view. That house was located in Wrightwood near the house that the Brewers had selected. On June 23, 1988, the black testers viewed the two houses. Afterwards, Munoz encouraged them to continue to look for homes with her.

### F. *Erwin Ernst*

Erwin Ernst is Matchmaker's sole shareholder and chief executive officer. He exercises day-to-day control over Matchmaker and its real estate agents. Tr. at 414. Ernst is a signator to the "Voluntary Affirmative Marketing Agreement" ("VAMA"), an organization sponsored by the National Association of Realtors in cooperation with the United States Department of Housing and Urban Development. VAMA commits the signators to full compliance with fair housing laws, including the avoidance of racial steering. Ernst has actively worked with other Chicago brokers to obtain their commitment to it. He has also vigorously promoted the Metro Listing Service, which integrates a variety of multiple listing services so that all listings will be available to homeseekers of every race. *See* Tr. at 845–49. Ernst and Matchmaker are members of the Metro Listing Service.

Ernst has established a number of written office policies and procedures for Matchmaker. *See* Tr. at 884–86. One of those policies is the requirement that all Matchmaker agents abide by VAMA and

---

**6.** We note also a portion of a report, admitted as evidence, that McCarthy wrote while Scarpiniti talked:

Ms. Scarpiniti mentioned that 'she knew she was breaking every law of the real estate industry but that she wants us to know where to live because we're from the northside.' She

also went on to state that 'east of Kedzie gets bad and even worse toward California' but that 'she never said that.' She defended herself by saying, 'when I sell a home I want people to know exactly where they are living.' Pl.'s Ex. 17.

all fair housing laws.[7] All of the individual defendants testified that they were aware of this policy. In pursuit of this policy, Ernst required all of his agents to attend fair housing training courses sponsored by local real estate boards.[8]

The magistrate judge found that Ernst was unaware at or near the time the events occurred of any of the tests performed by the Leadership Council. The magistrate judge also found that he was unaware of any pattern of conduct that those tests suggest. Op. of Nov. 7, 1990 at 25.

### G. Decision by the Magistrate Judge

After a bench trial, the magistrate judge ruled in favor of the plaintiffs and awarded them compensatory damages, punitive damages, and attorneys' fees. The magistrate judge found that agents King, Scarpiniti, Munoz, and Walker violated the Civil Rights Act of 1866 (Section 1982) and the Fair Housing Act (Sections 3604(a), (b), and (d)). The magistrate judge also held Matchmaker and Ernst vicariously liable for the discriminatory actions of the agents. The magistrate judge found that all plaintiffs—the Leadership Council, the plaintiff testers, and the City—suffered injuries as a result of defendants' actions.

Specifically, the magistrate judge ordered the defendants to pay each individual tester $1,000 in punitive damages for a total of $8,000. Of this amount, King, Munoz, Scarpiniti, and Walker were liable for $1,500 each, and Ernst and Matchmaker were liable for the remaining amount. The magistrate judge ordered the defendants to pay the Leadership Council a total of $16,500 as compensatory damages. The magistrate judge also awarded the Leadership Council $16,500 for frustration of its purpose and another $25,000 in punitive damages. King, Munoz, Scarpiniti, and Walker were each liable for $2,500 of the punitive damages. The magistrate judge ordered Matchmaker and Ernst to pay the remaining amount. Finally, the City received $25,000 in punitive damages of which King, Munoz, Scarpiniti, and Walker were each liable for $2,500. Again, the magistrate judge ordered Matchmaker and Ernst to pay the remaining amount. J. Order of June 6, 1991, *modified*, June 18, 1991, at 5–6. Pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(2), the magistrate judge held all defendants jointly and severally liable for plaintiffs' attorneys' fees and expenses. Mem.Decision of Nov. 18, 1991 at 11.[9]

## II. ANALYSIS

### A. Standing

Defendants argue on appeal that none of the plaintiffs were injured and therefore do not have standing. Appellants' Brief at 34–38; Appellants' Reply Brief at 15–18. We disagree and conclude that all the plaintiffs—the City, the Leadership Council, and the testers—have standing to sue.

■ Article III of the United States Constitution requires that federal courts decide only cases or controversies. U.S. Const. art. III, § 2, cl. 1. In order to satisfy this requirement, a party must show that "he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bell-*

---

7. Another of Matchmaker's policies prohibits racial steering. According to Erwin Ernst's testimony at trial, this policy states:

 All sales agents should be aware of the tendency to steer unintentionally when prospects do not specifically tell the sales agent where they want to view homes, the location is open. If in these instances non-minority prospects are only shown non-integrated areas and minorities are not shown non-integrated areas, it could be concluded that steering is occurring. Tr. at 940.

8. Agent Daniel King, for example, testified that the office policy was to "[t]reat everybody the same." Tr. at 531. King also testified that he attended two fair housing seminars, one run by the Southwest Suburban Board of Realtors and the other by the Chicago Real Estate Board. Tr. at 532.

9. The magistrate judge awarded the Leadership Council and the individual plaintiff testers fees and expenses in the amount of $135,718.59. The magistrate judge also awarded the City costs and fees of $25,565.25 and issued injunctive relief against defendants.

*wood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

The City in this case has standing. William Granderson, director of fair housing for the City, testified that racial steering leads to resegregation, the process by which a neighborhood which is predominantly white rapidly becomes populated by racial or ethnic minorities. Tr. at 428. People who have lived in the neighborhoods become panicked and lose interest in the community. Tr. at 431. This causes a destabilization of the community and a corresponding increased burden on the City in the form of increased crime and an erosion of the tax base. Tr. at 428. Further, the City's fair housing agency has to use its scarce resources to ensure compliance with the fair housing laws (including its own fair housing ordinances). The City's fair housing agency cannot perform its routine services—human relations training, community workshops, etc.—because it has to commit resources against those engaged in racial steering. Tr. at 432.

These injuries parallel those alluded to in *Gladstone,* also a racial steering case. There, the Supreme Court noted the adverse effects of racial steering on a city or town. 441 U.S. at 110–11, 99 S.Ct. at 1613. Such harms, the Court observed, include the reduction in the number of buyers in a particular community, with a corresponding decrease in property values. *Id.* at 110, 99 S.Ct. at 1613. "A significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." *Id.* at 110–11, 99 S.Ct. at 1613. Noting the importance to a community of promoting stable, integrated housing, the Court indicated that if a party's sales practices begin to rob a city or town "of its racial balance and stability, the [city or town] has standing to challenge the legality of that conduct." 441 U.S. at 111, 99 S.Ct. at 1613.

The injuries suffered by the City in this case are precisely those described in *Gladstone.* The City has shown that it has been injured by the defendants' illegal racial steering. The City, like the Village of Bellwood, Illinois in *Gladstone,* has standing.

The Leadership Council also has standing. "[T]he only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1526 (7th Cir.1990). *See also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982); *South–Suburban Housing Center v. Board of Realtors,* 935 F.2d 868, 878–80 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992). This standard is clearly satisfied in this case. The Leadership Council is a fair-housing agency. By conducting the investigation into Matchmaker's activities, the Leadership Council deflected its time and money from counseling to legal efforts directed against discrimination. The Leadership Council therefore has standing to sue.

Defendants' challenge to the testers' standing is equally without merit. We note that by enacting the Fair Housing Act, Congress "conferred on all 'persons' a legal right to truthful information about available housing." *Havens Realty,* 455 U.S. at 373, 102 S.Ct. at 1121. "A tester who has been the object of a misrepresentation made unlawful under § 804(d) [Section 3604(d) ] has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions." *Id.* at 373, 102 S.Ct. at 1121. "[A] tester to whom a real estate agent makes a misrepresentation forbidden by 3604(d) has standing to complain about the misrepresentation, because the statute creates a right to be free from such misrepresentations." *Dwivedi,* 895 F.2d at 1526. Here, the testers were treated in a "racially discriminatory fashion, even though they sustained no harm beyond the discrimination itself." *Id.* at 1527. We conclude that the testers have standing.[10]

10. As the Supreme Court pointed out in *Havens Realty,* Section 3604(d), unlike Section 3604(a),

### B. Liability and Compensatory Damages

Defendants next challenge the magistrate judge's award of compensatory damages.[11] Specifically, they allege that the magistrate judge erred by finding all the defendants liable.

 Compensatory damages are an appropriate remedy under both Sections 1982 and 3604. Given the facts of this case, the magistrate judge properly held all the defendants liable for compensatory damages. The individual agent defendants—King, Munoz, Scarpiniti, and Walker—all engaged in racial steering. The facts demonstrate that the four agents treated the black testers worse than the white testers. The magistrate judge's conclusion that this different treatment was because of race is amply supported by the record. Matchmaker agents King, Munoz, Scarpiniti, and Walker consistently steered white testers toward white areas and black testers toward black areas. The four agents also denied the black testers information about housing that they readily gave to similarly situated white testers. We agree with the magistrate judge's conclusion that the individual agents violated the testers rights under Sections 1982 and 3604. *See Dwivedi*, 895 F.2d at 1533 (holding, *inter alia*, that real estate brokers who treat customers differently from one another because of their race violate the Fair Housing Act); *Tolliver v. Amici*, 800 F.2d 149 (7th Cir.1986) (award of compensatory and punitive damages affirmed where tester treated differently because of race).

We also agree with the magistrate judge's decision to hold Matchmaker and Ernst vicariously liable for the unlawful behavior of King, Munoz, Scarpiniti, and Walker. We first consider Matchmaker's liability for compensatory damages. Then we examine Ernst's personal liability.

 The doctrine of *respondeat superior* "enables the imposition of liability on a principal for the tortious acts of his agent and, in the more common case, on the master for the wrongful acts of his servant." *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 392, 102 S.Ct. 3141, 3151, 73 L.Ed.2d 835 (1982). "As a matter of well-settled agency law, a principal may be held liable for the discriminatory acts of his agent if such acts are within the scope of the agent's apparent authority, even if the principal neither authorized nor ratified the acts." *Coates v. Bechtel*, 811 F.2d 1045, 1051 (7th Cir.1987).[12] This principle applies to suits brought under Sections 1982 and 3604. *Id. See also, e.g., Hamilton v. Svatik*, 779 F.2d 383, 388 (7th Cir.1985); *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 552 (9th Cir. 1980); *Moore v. Townsend*, 525 F.2d 482, 485 (7th Cir.1975). A principal cannot free itself of liability by delegating to an agent the duty not to discriminate. *Green v. Century 21*, 740 F.2d 460, 465 (6th Cir. 1984).

Federal courts have routinely applied these principles in fair housing cases and held principals liable for the discriminatory acts of their agents. For example, in *Walker v. Crigler*, 976 F.2d 900 (4th Cir. 1992), the plaintiff brought suit under the Fair Housing Act against the owner of rental property and his agent, a professional realtor. The plaintiff, a single mother, alleged that the realtor had discriminated against her because of her sex. *Id.* at 901. A jury found the realtor liable, but ruled in favor of the owner. On appeal, the Fourth

does not require that testers make a bona fide offer to rent or purchase. *Havens Realty*, 455 U.S. at 374, 102 S.Ct. at 1122.

**11.** Additionally, defendants raise several challenges to the factual findings of the magistrate judge. Upon our review of the record, we find that these claims are meritless and do not warrant discussion.

**12.** We note that the discriminatory acts of the four Matchmaker agents in this case were within the scope of their employment even though Matchmaker's policy prohibited such discrimination. *See Yates v. Avco Corp.*, 819 F.2d 630, 636 (6th Cir.1987) (employer liable for employee's actions committed within the scope of employment where employee engaged in sexual harassment that was forbidden by employer's policy). *See also Restatement (Second) of Agency* § 230 (1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment.").

Circuit held that the evidence was sufficient "to support the conclusion that [the owner] specifically intended that [the realtor] *not* discriminate." *Id.* at 904 (emphasis added). Given this finding, the court noted that "[t]he central question to be decided ... is which innocent party, the owner whose agent acted contrary to instruction, or the potential renter who felt the direct harm of the agent's discriminatory failure to offer the residence for rent, will ultimately bear the burden of the harm caused." *Id.* The court concluded that the Fair Housing Act's "overriding societal priority" requires that "the one innocent party with the power to control the acts of the agent, the owner of the property or other responsible superior, must act to compensate the injured party for the harm, and to insure that similar harm will not occur in the future." *Id.* The court therefore reversed and ordered the district court to enter a judgment of compensatory damages against the owner. *Id.* at 905.

 Here, Matchmaker (through Ernst), like the owner in *Walker*, specifically instructed its agents not to discriminate. As in *Walker*, the question we must decide is who among the innocent parties—the plaintiffs or Matchmaker and Ernst—should bear the responsibility for the discriminatory acts of Matchmaker's agents. We agree with the Fourth Circuit that "we must hold those who benefit from the sale and rental of property to the public to the specific mandates of anti-discrimination law if the goal of equal housing opportunity is to be reached." *Id.* at 905.

It is not enough, as defendants' argue, that Matchmaker's sales agents were described in their employment agreement as independent contractors. The magistrate judge found, and we agree, that the relationship between Matchmaker and its four agents—King, Munoz, Scarpiniti, and Walker—was an agency relationship. *See Heights Community Congress v. Hilltop Realty, Inc.*, 774 F.2d 135 (6th Cir.), *cert. denied*, 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 318 (1985).

We note that whether an agency relationship exists for purposes of the Fair Hous-

ing Act is a question to be determined by federal law. *Northside Realty Assoc., Inc. v. United States*, 605 F.2d 1348, 1354 n. 13 (5th Cir.1979). In *Hilltop Realty*, as here, the defendant realty corporation argued that its agents were independent contractors over whom it had no control. The Sixth Circuit disagreed and pointed out that "[t]his argument has consistently been rejected in Fair Housing cases." *Id.* at 141 (citing *Green*, 740 F.2d at 465 and *Northside Realty Assoc.*, 605 F.2d at 1353–54). The Fifth Circuit reached a similar conclusion in *Northside Realty*. There, the court held that, despite an employment agreement that purportedly established an independent contractor relationship, the realty corporation retained and exercised "full authority to hire, fire, or discipline its sales people." *Id.* at 1353 n. 11. The district court had found that the realty corporation directed the activities of its sales agents and that the sales agents had to sell exclusively through the realty corporation. *Id.* at 1353–54. Of the defendant's claim that the employment agreement established an independent contractor relationship, the Fifth Circuit observed that such "independent contractor" agreements are "standard in the real estate trade," and concluded that, in fact, an agency relationship existed between the realty corporation and its agents. *Id.* at 1353–54 & n. 11.

Similarly, Matchmaker and its agents were parties to an employment agreement that purportedly established an independent contractor relationship. In its attempt to show that an independent contractor relationship existed, however, Matchmaker is no more successful than the defendant in *Northside Realty*. The agreement does not defeat the agency relationship enjoyed by Matchmaker and its agents. All agents were bound to act in accordance with various Matchmaker policies. Significantly, the four agents worked in Matchmaker's offices under Ernst's day-to-day control and supervision. Matchmaker is, according to Ernst's testimony, "a very small company" where there is "a lot of one-on-one training." Tr. at 886. Ernst also reported of Matchmaker and its clients that "[w]e have a very small office here.

We meet people and know who they are." Tr. at 950. Additionally, VAMA—which Ernst signed and thereby committed Matchmaker to—required Ernst to make sure that the Matchmaker office performed according to that agreement and thereby conform to the fair housing laws. Tr. at 970. Matchmaker cannot avoid liability by arguing that it had no control over the acts of its agents.[13]

Our decision in *Hamilton v. Svatik*, 779 F.2d 383 (7th Cir.1985), further illustrates that the magistrate judge correctly held Matchmaker vicariously liable for compensatory damages. In *Hamilton*, a black woman sued defendants who, she alleged, refused to rent her an apartment in violation of Sections 1982 and 3604. *Id.* at 385. The defendants, Eleanor and Stephen Svatik, were brother and sister. Only Stephen Svatik (Eleanor's agent) discriminated against the plaintiff. Nevertheless, we held that "[a]lthough there may be no evidence of Eleanor's involvement in the incident, it is undisputed that she is the sole owner of the building and that her brother acts as her agent. In cases of racial discrimination in housing, a principal is liable for the wrongful acts of its agent." *Id.* at 388. We therefore concluded that Eleanor was vicariously liable for compensatory damages. *Id.* at 389.

Matchmaker, like Eleanor Svatik in *Hamilton*, is vicariously liable for the discriminatory acts of its agents. We affirm the magistrate judge's decision to hold Matchmaker liable for compensatory damages.

■ We also affirm the magistrate judge's decision to hold Erwin Ernst personally liable for compensatory damages. We note initially that "[i]n situations such as here, where common ownership and management exists, corporate formalities must not be rigidly adhered to when inqui-

ry is made of civil rights violations." *Clark v. Universal Builders*, 501 F.2d 324, 337 (7th Cir.), *cert. denied*, 419 U.S. 1070, 95 S.Ct. 657, 42 L.Ed.2d 666 (1974). In *Marr v. Rife*, 503 F.2d 735 (6th Cir.1974), the plaintiffs, black residents of Columbus, Ohio, sued the owner of a real estate agency and three of his agents for violations of Section 1982 and the Fair Housing Act. *Id.* at 736–37. The plaintiffs argued, *inter alia*, that the owner of the real estate agency should be liable for the conduct of his employees, even though there was no evidence that the owner himself had personally joined any of the discriminatory acts. *Id.* at 737, 740. Noting the Fair Housing Act's "broad legislative plan to eliminate all traces of discrimination within the housing field," the court reasoned that "[a]s owner of the agency, [the defendant] had at least the power to control the acts of his salesmen." *Id.* at 740, 742. The court therefore held that, on remand, the defendant owner would be vicariously liable for the discriminatory acts of his agents. *Id.* at 742, 744.

Here, as in *Marr*, Erwin Ernst is the sole owner of Matchmaker. He is also Matchmaker's chief executive officer. Significantly, he supervises the day-to-day operations of Matchmaker and its agents. Under these circumstances, we apply the rule announced in *Marr* and *Clark*. *See also Sanders v. Dorris*, 873 F.2d 938, 944 (6th Cir.1989) (owner of real estate agency cannot escape liability merely by asserting that it instructed its agents not to discriminate against blacks); *Phiffer*, 648 F.2d at 552 (owner of a motel, apartment complex, or other public housing facility is vicariously liable for discriminatory conduct of rental agent). Ernst is personally liable for compensatory damages.

■ The defendants also challenge the amount of the magistrate judge's

---

**13.** We note also that, according to defendants, "[b]y contract Matchmaker as managed by Ernst has no right or authority ... to 'direct or control salesperson's actions *except as specifically required by law....*'" Appellant's Brief at 39–40 (quoting the employment agreement between Matchmaker and its agents) (emphasis added). The law, as embodied in Sections 1982

and 3604, "specifically requires" that real estate agents not discriminate against persons because of their race. This contractual requirement demonstrates that by the very terms of the employment contract, Matchmaker retained authority to ensure that its agents conformed with the specific requirements of the law—in this case Sections 1982 and 3604.

award of compensatory damages. We will not reverse a judge's estimate of damages for intangible injuries, such as the plaintiffs suffered in this case, unless her estimate is clearly erroneous. *Douglas v. Metro Rental Servs., Inc.*, 827 F.2d 252, 256 (7th Cir.1987); *Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 190 (7th Cir.1982). "[T]he damages can be no more than what is within reason under the particular circumstances." *Douglas*, 827 F.2d at 256; *Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 190 (7th Cir.1982). *See also Seaton v. Sky Realty Co.*, 491 F.2d 634, 637–38 (7th Cir.1974) (compensatory damages may be awarded in housing discrimination case for humiliation suffered by plaintiffs). We will not reduce the amount of compensatory damages awarded by the magistrate judge unless that amount is clearly excessive. *Douglas*, 827 F.2d at 256.

The magistrate judge ordered the defendants to pay the Leadership Council $3,000 for the audits it performed in the investigation of this case. Next, the magistrate judge awarded the Leadership Council $5,000 for expected costs in the monitoring of Matchmaker's records for a period of five years and another $6,000 for continued auditing of Matchmaker's sales practices. Finally, the magistrate judge required the defendants to pay the Leadership Council $2,500 for the costs of training seminars it would perform. J. Order of June 6, 1991, *modified,* June 18, 1991, at 5–6. It was well within the magistrate judge's discretion to award these damages and the award itself is not clearly excessive.

We do agree, however, that the magistrate judge's decision to award $16,500 for frustration of purpose was error. The magistrate judge appears to have merely doubled the compensatory damage award. The magistrate judge failed to articulate any basis for this award. We have the " 'definite and firm conviction that a mistake has been committed' " in awarding damages for frustration of purpose. *Douglas*, 827 F.2d at 256 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)) (other citations omitted). Because the Leadership Council has provided no basis for a damage award for frustration of purpose, we reverse, as clearly erroneous, that part of the magistrate judge's decision.

## C. *Punitive Damages*

Defendants challenge the magistrate judge's decision to award punitive damages. First, they contend that the magistrate judge erroneously found King, Munoz, Scarpiniti, and Walker liable for punitive damages. Second, the defendants claim that it was error to hold Matchmaker and Ernst vicariously liable for punitive damages. We do not agree that the magistrate judge erred when she held King, Munoz, Scarpiniti, and Walker liable for punitive damages. We do agree, however, that the magistrate judge erred when she held Matchmaker and Ernst liable for punitive damages.

In fair housing cases, punitive damages are awarded to punish and deter outrageous conduct. *See Douglas*, 827 F.2d at 257. Punitive damages are appropriate when defendants act wantonly and willfully or are motivated in their actions by ill will, malice, or a desire to injure the plaintiffs. *Tolliver*, 800 F.2d at 151; *Hamilton*, 779 F.2d at 389. " '[An] award of punitive damages should be set aside only if it exceeds what is required to serve the objective of deterrence and punishment.' " *Tolliver*, 800 F.2d at 151 (quoting *Hamilton*, 779 F.2d at 389).

In applying these principles to this case, we have no difficulty in affirming the portion of the magistrate judge's decision that held King, Munoz, Scarpiniti, and Walker liable for punitive damages. Defendants argue that they should not be liable for punitive damages because they did not act maliciously towards the defendants and treated them politely. Appellants' Brief at 44. Good manners, however, do not insulate individuals from punitive damages. Although these four agents may have been courteous to the testers, their behavior demonstrates that they actively

discriminated against the black testers because of their race in violation of Sections 1982 and 3604. The law does not tolerate this behavior and punitive damages are an appropriate remedy when real estate agents engage in such blatantly obvious racial discrimination. *See Tolliver*, 800 F.2d at 151–53 (affirming an award of punitive damages in fair housing case against party that engaged in discriminatory behavior); *Hamilton*, 779 F.2d at 389 (same).

The magistrate judge also held Matchmaker and Erwin Ernst liable for punitive damages. The magistrate judge found that once the plaintiffs filed their complaint, Ernst did nothing to investigate whether his agents were behaving in a discriminatory fashion. The magistrate judge reasoned that "[a]bsent the post-complaint inactivity of Ernst, the court would not be convinced that Ernst's conduct amounted to callous indifference to plaintiffs' rights or ratification of the agents' conduct justifying an award of punitive damages." Mem.Decision and Order of April 5, 1991 at 4. The magistrate judge concluded that "[e]ven if treated only as accusations, his failure to investigate or impose additional safeguards can hardly be viewed as other than knowledgeable inaction." *Id.* Based upon these findings, the magistrate judge held Ernst liable for punitive damages.

 In *Hamilton*, we considered whether a principal should be liable for punitive damages if she did not engage in the discriminatory activity. We noted that "[a] principal is liable for punitive damages for the discriminatory acts of her agent *only if* she knew of or ratified the acts." *Hamilton*, 779 F.2d at 389 (emphasis added). We reversed the punitive damages award against the principal in *Hamilton*

because she was unaware of and did not ratify the discrimination. Our ruling in *Hamilton* controls our decision here. Because we find no evidence that Ernst knew of or ratified the agents' discriminatory acts, we reverse the punitive damages award against Matchmaker and Ernst.

There is nothing in the record to suggest that Ernst knew of or ratified his agents' discriminatory actions.[14] In fact, the record reveals that Ernst affirmatively worked against discrimination in housing. Not only is Ernst a signator of VAMA, he has actively tried to get other Chicago brokers to sign it. He has also established written office policies for Matchmaker that require all Matchmaker agents to abide by VAMA and the fair housing laws. All of the individual defendants testified that they believed they would be fired if they violated Ernst's anti-discrimination policies.[15] In pursuit of his fair housing policy, Ernst required all of his agents to attend fair housing training courses sponsored by local real estate boards.

These facts hardly suggest that Ernst "knew of or ratified" his agents' discriminatory acts. Matchmaker and Ernst cannot, under *Hamilton*, be liable for punitive damages. The magistrate judge's conclusion that Ernst's post-complaint inactivity suffices for a finding of punitive damages is erroneous. *See Davis v. Mansards*, 597 F.Supp. 334, 347 (N.D.Ind.1984) (punitive damages can be assessed against a principal under the doctrine of respondeat superior if the principal knew of or ratified the acts of its employees or agents). *Cf. Miller v. Apartments and Homes of New Jersey, Inc.*, 646 F.2d 101, 111 (3d Cir.1981) (principal liable for punitive damages for the conduct of his agent when he was by action or knowledgeable inaction, involved in the wrongdoing or when he authorized,

**14.** We note that whether Ernst should have known of his agents discriminatory conduct is a question, under *Hamilton*, that we need not consider for purposes of deciding whether Matchmaker and Ernst should be liable for punitive damages. In order to justify an award of punitive damages against a principal, the standard we announced in *Hamilton*—knowledge or ratification by the principal of the agent's discriminatory act—requires a greater showing

than mere negligence. *See Hamilton*, 779 F.2d at 389.

**15.** For example, the magistrate judge noted of test five: "That Carol Scarpiniti found it necessary to close the door when she engaged in blatant steering may also indicate that she understood that steering was not condoned at Matchmaker." Mem.Decision and Order of April 5, 1991 at 4.

ratified, or fostered the acts complained of); *Fort v. White*, 530 F.2d 1113, 1117 (2d Cir.1976) (punitive damages are assessed against an employer for the torts of his employee only where the former in some way authorized, ratified, or fostered the acts complained of); *Marr*, 503 F.2d at 744–45 (principal may be liable for punitive damages under Section 1982 and Fair Housing Act if by action or knowledgeable inaction the principal was involved in the wrongdoing). Because we do not believe that Ernst's post-filing inactivity shows knowledge or ratification of the discriminatory acts of Matchmaker's agents, we reverse the punitive damages award against Matchmaker and Ernst.

### D. *Attorneys' Fees*

Defendants challenge the magistrate judge's award of attorneys' fees. This issue is raised for the first time on appeal. Defendants state two reasons why they did not challenge the magistrate judge's decision to award attorneys' fees. First, they contend that they did not challenge the award because defendants are not financially capable of paying the award. Appellants' Reply Brief at 23. Second, they argue that they did not raise the issue because they believed that the magistrate judge would have ignored their arguments. *Id.*

Arguments raised for the first time on appeal are ordinarily waived. *Matter of Establishment Inspection of Microcosm*, 951 F.2d 121, 126 (7th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992); *United States v. Blythe*, 944 F.2d 356, 359 (7th Cir.1991). We will not consider arguments raised for the first time on appeal "except in rare cases involving jurisdiction or if justice demands flexibility." *Magicsilk Corp. of N.J. v. Vinson*, 924 F.2d 123, 125 (7th Cir.1991).

Jurisdiction is not at issue and justice, in this case, does not demand flexibility. The defendants' reasons for not raising the issue earlier are unpersuasive. Their first reason—that they could not afford to pay the amount—could have been explained to the magistrate judge. Their second reason alleges, without any evidence, that the magistrate judge somehow lacked the ability to decide issues fairly. "Allegations of judicial bias are very serious and should never be cast without substantiation." *Matter of Wade*, 969 F.2d 241, 243 n. 1 (7th Cir.1992). The defendants' charge impugns the integrity of the magistrate judge and we will not consider such an unsupported allegation. By challenging the attorneys' fees award for the first time on appeal, the defendants have waived the issue.

### III. CONCLUSION

We affirm the magistrate judge's decision to hold King, Munoz, Scarpiniti, and Walker liable for compensatory and punitive damages. We also affirm the magistrate judge's decision holding Matchmaker and Ernst vicariously liable for compensatory damages. We reverse the portion of the magistrate judge's decision that awarded damages to the Leadership Council for frustration of purpose. We also reverse the punitive damages award against Matchmaker and Erwin Ernst. The defendants' challenge to the attorneys' fee award was waived and is denied.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.